1997 SD 16

**Edwin E. EVANS, Plaintiff and Appellee,**

**v.**

**Cynthia S. EVANS, Defendant and Appellant.**

**Nos. 19604, 19626.**

Supreme Court of South Dakota.

Considered on Briefs Dec. 4, 1996.

Decided Feb. 19, 1997.

Mark V. Meierhenry of Danforth, Meierhenry & Meierhenry Sioux Falls, for plaintiff and appellee.

Lee R. Burd, Sioux Falls, for defendant and appellant.

GILBERTSON, Justice.

[¶ 1] Cynthia (Cyndy) Evans and Edwin (Ed) Evans both appeal issues arising from the circuit court's division of property and awards of child support and alimony, and attorney's fees. We affirm, except to reverse and remand to the trial court for an appropriate discounting of the valuation of the insurance policies together with a corresponding equitable property adjustment, addressed under issue two, *infra.*

## FACTS AND PROCEDURE

[¶ 2] Ed and Cyndy were married in June 1973, following completion of Ed's first year of law school. Cyndy had completed her college degree and worked full time from the beginning of the marriage until the parties moved to Sioux Falls in June 1977. At that time Cyndy was expecting her first child. She did not return to the work force.

[¶ 3] The parties' lifestyle was such that they belonged to a country club, had household help, and dined out frequently. They generally took two family vacations a year. The record reflects Ed worked many hours, including evenings and some weekends, and was often required to be out of town for days to weeks at a time. Cyndy volunteered her time in community, church, and school-related activities.

[¶ 4] The parties have two children, Ashley and Kelsey, who were ages 17 and 14, respectively, at the time of the divorce trial. They attend parochial school and participate in many school and extracurricular activities. They drive late model cars and wear the best brand-named clothing. Cyndy has largely been responsible for coordinating the children's activities. While Ed was not available as much as Cyndy, he, too, took an active interest in their children, assisting them with their homework and driving them to out-of-town functions.

[¶ 5] In 1990, the parties began construction of a new home in Sioux Falls which ultimately cost considerably more money than had been originally planned. Around this time, Cyndy discontinued her volunteer activities and devoted her time instead to tennis and other personal interests. The parties admit they had problems with communication; the marriage began to deteriorate. In 1993, Cyndy invited a twenty-seven-year-old male tennis friend to move into the

family's residence without discussing it with Ed and without his knowledge. When Ed learned of his wife's house guest, he left home for a few days but returned at the children's request. He attempted to improve his relationship with Cyndy, but she showed little interest in his attempts and spent evenings out with her friends, returning home in the early morning hours. Ed moved into a separate bedroom to show his displeasure, but the couple did not discuss their problems. By the summer of 1994, Cyndy had ceased attending family vacations, preferring instead to spend time with her friends at Lake Okoboji, while Ed and the children took family vacations without her. In the fall of 1994, Ed learned Cyndy was having an affair with a man who owned a home in Lake Okoboji. Although Cyndy initially denied the affair, she eventually admitted it was true. Upon learning this, Ed moved out of the parties' home.

[¶ 6] Ed and Cyndy attempted a reconciliation, Cyndy promising to discontinue the affair and Ed promising to spend less time at work and more time with Cyndy and the children. Ed returned home, bought Cyndy a new car that she wanted, planned a family vacation in Jamaica for Thanksgiving, and purchased tickets for a concert Cyndy wanted to attend in Minneapolis. Within four days of Ed's return home, Cyndy announced she did not intend to stop seeing other men. Ed left home for the last time.

[¶ 7] He continued spending time with Cyndy however, and the family went on the planned vacation and to the concert and shopping trips in Minneapolis. Ed continued to provide spending money and paid the household expenses. He reduced his hours at work. Ed sought counseling and encouraged Cyndy to attend counseling sessions with him, or alone. She refused. Ed eventually gave up trying to reconcile the marriage.

[¶ 8] During this period of separation, Ed paid Cyndy $10,000 per month to support her and their children. She stated they could not live on this amount. Ed suggested she sell the house. Cyndy refused and Ed filed the divorce action.

[¶ 9] The trial court heard the matter over a four-day period, October 30–31, 1995, and on December 12–13, 1995. The trial court determined issues involving child support, property division, alimony award, and attorney fees. On February 16, 1996, the trial court awarded Ed a divorce on grounds of adultery and dismissed Cyndy's counterclaim. Both parties appeal the judgment of the trial court.

[¶ 10] Cyndy raises three issues as follows:

1. Whether the trial court abused its discretion in failing to consider the children's actual needs and standard of living in setting child support?
2. Whether the trial court erred by transferring ownership of insurance policies from the parties to the children, thereby excluding the property from the marital assets?
3. Whether the trial court erred in determining the amount of alimony awarded?

[¶ 11] Ed raises two issues by Notice of Review:

1. Whether the trial court erred in awarding rehabilitative alimony?
2. Whether the trial court erred in awarding attorney fees?

[¶ 12] We will address each issue seriatim.

## ANALYSIS AND DECISION

**[¶ 13] 1. Whether the trial court abused its discretion in failing to consider the children's actual needs and standard of living in setting child support?**

[¶ 14] SDCL 25–7–6.2 provides guidelines that trial courts must follow in setting child support amounts. However, where the parties' income exceeds the statutory guidelines, SDCL 25–7–6.9 provides the child support obligation "shall be established at an appropriate level, taking into account the actual needs and standard of living of the child." In *Jones v. Jones,* 472 N.W.2d 782, 785 (S.D. 1991), we held establishment of child support obligations above the statutory guidelines was within the trial court's discretion, taking into account the child's actual needs and standard of living. *Accord Earley v. Earley,* 484 N.W.2d 125, 127–28 (S.D.1992), *cert. de-*

*nied,* 506 U.S. 895, 113 S.Ct. 272, 121 L.Ed.2d 200 (1992). *See also Bloom v. Bloom,* 498 N.W.2d 213, 217 (S.D.1993) ("the trial court *may* calculate support by mathematical extrapolation, but it is not obligated to do so.... [T]he essential inquiry remains the actual needs and standard of living of the children." (Emphasis in original.)).

[¶ 15] Cyndy sought $5,000 per month in child support, however, she produced an exhibit which listed expenses of $4,410 per month. Itemized, this figure included:

| | |
|---|---|
| $ 400 | for food |
| 580 | for vehicle expense |
| 110 | per month for medical expense |
| 550 | per month for educational expense |
| 500 | per month for vacations |
| 100 | per month for dining out |
| 550 | for entertainment and allowances |
| 200 | for clothing purchases |
| 1300 | for tennis expenses (Kelsey only) (clothes, supplies, lessons, tournament travel) |
| 60 | for piano lessons |
| 25 | for beauty shop expenses |
| 25 | for cosmetics expenses |
| 10 | for newspapers and subscriptions |
| $4,410 | |

[¶ 16] The trial court ruled at an interim hearing that $1,300 per month for tennis expenses was clearly excessive and Ed would not be required to pay this expense. In so doing, the trial court noted:

> [W]hile the parties may jointly decide that they want the children to participate in tennis activities to that extent, that needs to be a joint decision of the parties including a joint decision as to how that will be paid for. If the parties mutually agree that they want to provide those kind of opportunities for the girls they are certainly entitled to do so but the court will not force husband to engage in that kind of expenditures. The decision in [*Ochs v. Nelson,* 538 N.W.2d 527 (S.D.1995)] was that the child should be allowed to participate in *some* of the father's high standard of living and did not mandate that the child be permitted to engage in *all* of the father's high standard of living. (Emphasis in original.)

*See Bloom,* 498 N.W.2d at 218 (trial court did not abuse its discretion in failing to find a cello, designer clothing, ballet lessons and language camps did not constitute children's needs in determining amount of child support obligation).

[¶ 17] Subtracting the $1,300 per month tennis expense from Cyndy's itemized living expenses for the children leaves a balance of $2,185 per month. The trial court ordered Ed to pay child support in this amount, plus pay $500 per month in allowances directly to the children, and $600 per month for their tuition at parochial school, and provide health insurance for each child, for a total child support obligation of $3,505 per month.[1] The trial court noted that Ed had agreed to pay the children's allowances, parochial school tuition, medical insurance, and college expenses. The trial court noted this child support award still provided a "luxurious lifestyle" for the two girls.[2]

[¶ 18] On appeal, Cyndy notes the amount of Ed's child support obligation, as determined by the trial court, is approximately 12% of his $25,000 net monthly income. Cyndy argues the trial court made two errors: 1) it applied the wrong legal standard by focusing on the children's needs rather than their standard of living; and 2) it substituted its personal judgment of what the children's standard of living should be, for the standard set by the parties themselves during their marriage.

[¶ 19] In the trial court's memorandum decision, it cited "the needs of the children and the father's ability to pay" as the standard for determining child support obli-

1. We note several of these items the trial court ordered Ed to pay *in addition to* the $2,185 amount were already included in the $2,185 total in Cyndy's list of expenses. Therefore, the amount actually awarded is closer to the amount requested by Cyndy than she argues in her appeal to this Court.

2. Supplemental information in Ed's brief to this Court notes his older daughter graduated from high school in May 1996 and is currently enrolled in a private college in Minnesota. Ed continues to pay Cyndy the amount ordered by the trial court for two children and has not moved for a reduction of that amount.

gations above the statutory guidelines. It then stated that because the father's ability to pay was not at issue in this case, the only consideration need be the "reasonable needs of the children." This solitary consideration does not reflect the standard set by statute and prior caselaw. As noted above, the trial court's inquiry is to take into account the actual needs and standard of living of the children. However, the record reflects the trial court did not apply only the reasonable needs of the children and that it did consider their standard of living in making its determination.

[¶ 20] A trial court is not required to accept either party's claimed expenses. To do so would remove the trial court's discretion in setting child support obligations where the parties' income exceeds the guidelines set forth in SDCL 25–7–6.2. Cyndy has the burden of proving her claimed expenses reflect the children's needs and standard of living. *Billion v. Billion,* 1996 SD 101, ¶ 40, 553 N.W.2d 226, 235 (quoting *Ochs,* 538 N.W.2d at 530).

[¶ 21] Cyndy's claim of $1,300 per month ($15,600 annually) for tennis expenses is a projected expense for only one of the couple's daughters, which includes Cyndy's traveling expenses to accompany her daughter. Ed points out, which Cyndy does not dispute, that this projected expense is $6,760 per year more than was spent in 1995 for Kelsey to travel and participate in tournaments in several states. Ed also notes, which Cyndy does not dispute, that this projection is based in part on daughter Ashley's involvement with tennis, which she severely curtailed after her sixteenth birthday. At the time of this appeal, Kelsey is fifteen years old. As such, Cyndy has failed to prove the $1,300 per month is reflective of Kelsey's standard of living prior to the couple's divorce. *See Billion,* 1996 SD at ¶ 41, 553 N.W.2d at 235 (citing *Ochs,* 538 N.W.2d at 531) ("obviously, in divorce cases a child's standard of living reflects the parent's standard of living before they separated"). We also note that while Cyndy argues her projection of monthly expenses is "not unreasonable" given Ed's monthly net income of $25,000, this type of comparison is not the appropriate factor the trial court must consider. The trial court did not abuse its discretion in ordering support in an amount that will adequately care for the children's actual needs and permit them to enjoy a standard of living commensurate with that prior to their parents' divorce. *Billion,* 1996 SD at ¶¶ 41–45, 553 N.W.2d at 235–36.

[¶ 22] 2. **Whether the trial court erred by transferring ownership of insurance policies from the parties to the children, thereby excluding the property from the marital assets?**

[¶ 23] SDCL 25–4–44 authorizes the trial court to "make an equitable division of the property belonging to either or both, whether the title to such property is in the name of the husband or the wife." South Dakota is considered to be an "all property state" in that " 'all property of either or both divorcing parties is subject to equitable division by the court, regardless of title or origin.' " *Endres v. Endres,* 532 N.W.2d 65, 68 (S.D.1995) (quoting *Radigan v. Radigan,* 465 N.W.2d 483, 486 (S.D.1991)). In *Endres,* we noted our well-established standard of review of a trial court's division of marital property:

> 'This court will not disturb a division of property unless it clearly appears the trial court abused its discretion.' *Vander Pol v. Vander Pol,* 484 N.W.2d 522, 524 (S.D. 1992); *Kanta v. Kanta,* 479 N.W.2d 505 (S.D.1991); *Johnson v. Johnson,* 471 N.W.2d 156 (S.D.1991); *Fox v. Fox,* 467 N.W.2d 762 (S.D.1991). While this discretion is broad, it is not uncontrolled and must be soundly and substantially based on the evidence. *Gibson v. Gibson,* 437 N.W.2d 170, 171 (S.D.1989); *Goehry v. Goehry,* 354 N.W.2d 192 (S.D.1984); *Owen v. Owen,* 351 N.W.2d 139 (S.D.1984). The omission of assets which should properly be included as marital property is an abuse of discretion. *Gibson,* 437 N.W.2d at 171; *Prentice v. Prentice,* 322 N.W.2d 880 (S.D. 1982); *Guindon v. Guindon,* 256 N.W.2d 894 (S.D.1977).

*Id.* at 67.

[¶ 24] Cyndy claims the trial court erred in removing from the marital property four insurance policies owned by Ed and Cyndy,

having a cash value in excess of $100,000, and transferring those policies to the children. As the trial court had determined the marital property should be divided 50/50 between the parties, Cyndy argues this error provided the children with a windfall "gift" and caused a loss of over $50,000 to each party. At the outset of discussion of this issue, we note the trial court's conclusions of law addressed five insurance policies: "The three New York Life Insurance Policies, the Prudential Policy and the Northwestern Policy shall be maintained for the benefit of the children." The court determined the value of these policies to be $100,221.

[¶ 25] Our review of the settled record in this case indicates Cyndy's formulation of the issue statement in this section of her appellate brief mischaracterizes the trial court's discussion of this issue at trial and its conclusion of law regarding these insurance policies. Review of the trial transcript reflects that Ed proposed these policies be set aside from the marital estate and that the children be made the beneficiaries of the policies so they would have sufficient money for their needs should Ed die before the children are raised. Cyndy agreed that Ed should be required to provide certain funding, but that such requirement could be fulfilled by the purchase of inexpensive term life insurance policies rather than, what she characterized as, converting marital assets into children's assets. The trial court responded that if this insurance is used to secure Ed's payments to his children, there would not be any cash available to him from these policies, and therefore, in the trial court's opinion, it would not be fair to charge these policies against Ed if he cannot make use of them. The trial court then ordered that the children be made the beneficiaries of these five policies, that Ed be required to maintain these policies, and that he not encumber them in any way.

█ [¶ 26] Under these facts, the trial court has not transferred ownership of these policies from the marital estate to the children. Ed remains the owner of these five policies. The parties' children have been made the policies' beneficiaries.[3] Ed was not merely required to maintain a specific amount of insurance for his children's benefit but was required to name his children as beneficiaries to policies Ed already owned. *See In re Estate of Lemer,* 306 N.W.2d 244, 246 (S.D.1981). The trial court refused to assign the value of these policies to Ed in making its property division because, under the conditions set down by the court, it concluded these policies have no value to Ed. By court order, he must maintain them for the benefit of the parties' children and cannot encumber them in any way; their value is of no current use to him directly, but only indirectly, as security for his daughters' welfare. *See Merchant v. Merchant,* 130 Mich. App. 566, 343 N.W.2d 620, 625 (1983) (provision in judgment and decree of divorce ordering insurance to be maintained for benefit of minor children of the marriage may be viewed as security of court-ordered child support). *Cf.* SDCL 25-4-42 (providing in part that "[t]he court may require a spouse to give reasonable security for providing maintenance, or making any payments required under the provisions of this chapter....")

█ [¶ 27] In making an equitable division of property under SDCL 25-4-44, the trial court "shall have regard for equity and the circumstances of the parties." The trial court has broad discretionary authority in dividing the marital property. *Endres,* 532 N.W.2d at 67. The facts of this case do not present the situation where the trial court has omitted certain of the marital property and failed to consider it in making its property division. *See Gibson,* 437 N.W.2d at 172 (omission of assets which should properly be included as marital property is an abuse of discretion). In the present case the trial court, in "regard for equity and the circumstances of the parties," considered the five insurance policies and declared they shall be maintained by Ed for the benefit of the children. Although the trial court denotes these policies as "given to children" for purposes of valuation of marital assets, we note that the trial court did not order conveyance of this property to the children, nor did it assign the policies' present value to Ed in making its property division. Since owner-

3. Prior to the divorce, Cyndy and the children were the named beneficiaries of these policies.

ship of the policies remain with Ed, the court's order was in actuality a property distribution to Ed for the children's benefit. *See Hunter v. Hunter,* 498 N.E.2d 1278, 1291 (Ind.App.1986) (and cases cited therein). In light of the children's present ages, the amount of the child support obligation, and the fact that Ed is required by judgment of the court to provide for the children's post-secondary education, we find the trial court's ordering these policies maintained for the children's benefit to be "soundly and substantially based on the evidence." Ed has a statutory obligation to provide support for the parties' children. *See* SDCL 25-7-6.1 (obligation to provide "for the necessary maintenance, education and support of the child").

[¶ 28] Despite our finding of no transfer of ownership of the policies, we hold that a more appropriate treatment of their valuation would have been to discount their value to Ed rather than zeroing their value out. The logic for this particular treatment lies in their assignment by the trial court as security for Ed's obligation to provide financial support to his children until completion of their post-secondary education. After that point in time, Ed is relieved of his obligation to provide further child support and the need for security of such payments likewise ceases to exist. We reverse and remand to the trial court to enter an appropriate discounted value on the insurance policies. In keeping with the trial court's pronouncement of attempting an equal distribution of the marital assets, the trial court should then make an adjustment in the award to Cyndy to offset the discounted value of the policies awarded to Ed. We hold that in the remanding of this issue, which will result in an increased property award to both Ed and Cyndy in an equal amount, this does not sufficiently impact the property division by itself, as to necessitate a further reexamination of the alimony award. *See* issue three, *infra,* at ¶ 31.

[¶ 29] 3. **Whether the trial court erred in determining the amount of alimony awarded?**

[¶ 30] The trial court awarded Cyndy rehabilitative alimony of $2,500 per month for six months, and $1,000 per month for five years thereafter. Cyndy's vocational expert opined, and the trial court found, that she would be able to earn $25,000 per year within three to five years, after retraining and reentering the work force. Cyndy appeals this award, arguing she is entitled to substantially more alimony. She bases her argument on her years of service to the marriage as a wife and homemaker and the vast discrepancy between earning capabilities of the parties.

[¶ 31] Our standard of review of challenges to a trial court's award of alimony is well-established. *Dussart v. Dussart,* 1996 SD 41, ¶ 9, 546 N.W.2d 109, 111; *DeVries v. DeVries,* 519 N.W.2d 73, 77 (S.D.1994).

> A trial court is vested with discretion in awarding alimony and its decision will not be disturbed unless it clearly appears the trial court abused its discretion. Trial courts must consider the following factors when setting an alimony award: (1) the length of the marriage; (2) the parties' respective ages and health; (3) the earning capacity of each party; (4) their financial situations after the property division; (5) their station in life or social standing; and, (6) the relative fault in the termination of the marriage. A trial court's findings on these factors must support its legal conclusions. As often stated, an abuse of discretion exists only where discretion has been 'exercised to an end or purpose not justified by, and clearly against, reason and evidence.'

A trial court is obligated to consider the alimony and property division together. *Kappenmann v. Kappenmann,* 479 N.W.2d 520, 523 (S.D.1992); *Ryken v. Ryken,* 461 N.W.2d 122, 127 (S.D.1990) (*Ryken II*).

[¶ 32] Additional factors must be considered when the trial court makes an award of rehabilitative alimony. *Saint-Pierre v. Saint-Pierre,* 357 N.W.2d 250, 262 (S.D.1984). In awarding rehabilitative or reimbursement alimony, the trial court should be guided by "the amount of supporting spouse's contributions, his or her foregone [sic] opportunities to enhance or improve professional or vocational skills, and the du-

ration of the marriage following completion of the nonsupporting spouse's professional education." *Id.* An award of rehabilitative alimony must be designed to meet an educational need or plan of action whose existence finds some support in the record. *Radigan,* 465 N.W.2d at 486; *Ryken v. Ryken,* 440 N.W.2d 300, 303 (S.D.1989) (*Ryken I*). "[T]he decision to award 'reimbursement' or 'rehabilitative' alimony, and, if so, in what amount and for what length of time, is committed to the sound discretion of the trial court. The purpose of rehabilitative alimony is to put the supporting spouse in a position to likewise upgrade their own economic marketability." *Studt v. Studt,* 443 N.W.2d 639, 643 (S.D.1989) (internal citations omitted).

[¶ 33] A review of the record in this case demonstrates the trial court considered all the necessary factors, including Cyndy's traditional role of homemaker[4] and the parties' discrepancy in earning capabilities.[5] The trial court also considered Cyndy's financial situation after the property division and her fault in the dissolution of the parties' marriage and lack of cooperation in Ed's efforts to save the marriage. In granting a divorce in favor of Ed on the basis of adultery, the trial court had before it numerous examples of uncontested marital misconduct by Cyndy upon which to base its finding of fault:

1. Moving into the family home a twenty-seven-year-old male tennis friend without Ed's prior knowledge or consent;
2. Refusing to attend family vacations as in the past, but rather vacationing at Lake Okoboji with friends;
3. Having an affair with a man who owned a home at Lake Okoboji;
4. Refusing to stop seeing other men after Ed found out about the affair, and when Ed attempted reconciliation; and
5. Refusing to attend when Ed sought counseling and encouraged Cyndy to attend either with him or alone.

The trial court properly concluded that Cyndy's fault was a factor to be taken into account in deciding alimony.

[¶ 34] Following division of the marital property, Cyndy leaves the marriage with over one million dollars in assets. Approximately $400,000 of these assets are in the form of cash payments to be paid to Cyndy by Ed either immediately or over a period of the next five years at 7% interest on the unpaid balance. The trial court found that, through conservative investment, Cyndy's liquid assets would provide annual income to her of $40,792, or $3,399 per month, without invading the principal. Following three to five years of wage-earning, this monthly income would rise to $4,782 per month. The trial court specifically noted that Cyndy would not be able to live in the luxurious lifestyle she enjoyed while married to Ed but, at the same time, should not be able to demand excessive long-term support from the husband to whom she did not wish to be married. The trial court concluded Cyndy should be able to live comfortably on the amount awarded. The court acknowledged Cyndy's contribution to the family's accumulation of wealth and her husband's success, and further noted the award was justified due to Cyndy's forgone employment opportunities during the parties' twenty-two year marriage. We cannot say the trial court's award was against reason and the evidence.

[¶ 35] Regarding an "educational need or plan of action" that must be evidenced from the record for an award of rehabilitative alimony, *Radigan,* 465 N.W.2d at 486, Cyndy presented herself for evaluation by the vocational rehabilitation specialist who testified on her behalf. Following his evaluation, which included a personal interview with Cyndy, taking her educational and work his-

4. The trial court reasoned on this point:

> The court doesn't doubt the wife's claims that there was an agreement (express or implied) that husband work on his career and wife would stay at home to raise the children and be active in volunteer work (although she has not been particularly active in volunteer work in recent years). However, such a family contract would have other express or implied terms including an agreement of fidelity to the marriage. The wife cannot expect to breach the family contract and then demand that the husband live up to its obligations.

5. At the time of the divorce Ed's annual income was $485,000.

tory, and submitting her to various vocational and personality-type testing, this expert concluded Cyndy's best course of action for reentering the work force would be to complete approximately six months of select computer courses at a vocational school and begin work in an entry-level position in the banking field. Cyndy had worked in banking before the parties moved to Sioux Falls in 1977 and her test scores in the vocational evaluation demonstrated a high interest and ability in this area. Her test scores also were high in the fields of business and sales. Although Cyndy did not express to this specialist any specific plans for employment or retraining during their interview, it was noted by the expert at trial that this is not unusual for a person who had not been career-minded during a long marriage and is presently going through a divorce. The vocational rehabilitation specialist testified he and Cyndy discussed assistance with her career development after the divorce.

[¶ 36] We affirm on this issue.

[¶ 37] 4. **Whether the trial court erred in awarding rehabilitative alimony?**

[¶ 38] This is Ed's first issue by Notice of Review. He states he accepts the trial court's decision on all issues and wishes this Court to consider this issue on appeal only if we reverse any part of the trial court's decision. Our decision to reverse and remand for appropriate discounting of the insurance policies under issue two necessitates an examination of this issue. In so doing, we see no reason to modify the holding of the trial court. *See* ¶ 28, *supra.*

[¶ 39] 5. **Whether the trial court erred in awarding attorney fees?**

[¶ 40] The decision to award attorney fees is within the sound discretion of the trial court. *Henrichs v. Henrichs,* 426 N.W.2d 569, 573 (S.D.1988); *Wallahan v. Wallahan,* 284 N.W.2d 21 (S.D.1979). In determining whether to award attorney's fees, the trial court should consider the property owned by each party, their respective incomes, the liquidity of the moving party's assets and whether either party unreasonably increased the time spent on the case. *Grode v. Grode,* 1996 SD 15, ¶ 38, 543 N.W.2d 795, 804; *Harvey v. Harvey,* 383 N.W.2d 862 (S.D.1986); *Garnos v. Garnos,* 376 N.W.2d 571 (S.D.1985). On review, we examine the trial court's analysis of the following elements pertinent to fixing legal fees generally: (1) the amount and value of the property involved; (2) the intricacy and importance of the litigation; (3) the labor and time involved; (4) the skill required to draft pleadings and try the case; (5) the discovery procedures utilized; (6) the existence of complicated legal problems; (7) the time required; (8) whether briefs were required; and (9) whether an appeal to this court is involved. *Henrichs,* 426 N.W.2d at 573.

[¶ 41] The trial court awarded Cyndy $15,000 in attorney fees. The court found that the amount and value of the parties' property, over two million dollars' worth, impacted all of the above factors it must consider in determining whether the requested attorney fees are reasonable.

[¶ 42] Once the trial court determined the requested fees were reasonable, it was bound to consider the property owned by each party, their relative incomes, whether Cyndy's property was liquid, and the reasonableness of the parties' actions, to determine whether an award should be made. The trial court concluded each party was awarded approximately $1,100,000 in property; that there is a great disparity in the parties' present and anticipated incomes; that while Cyndy's property is, for the most part, liquid, liquidating such property would decrease her long-term earnings which the court attributed to her in making its decisions on property division, child support, and alimony; and that both parties have claimed the other to be unreasonable—Ed claiming Cyndy unreasonable in not agreeing to a divorce on grounds of irreconcilable differences and thus avoiding a trial on fault, and Cyndy claiming Ed obstructed the necessary discovery in this case. Taking all of this into consideration, the trial court awarded attorney fees of $15,000 plus sales tax to Cyndy. We do not find the trial court abused its discretion in making this award.

[¶ 43] **6. Appellate Attorney Fees**

[¶ 44] Pursuant to the rule set forth in *Malcolm v. Malcolm,* 365 N.W.2d 863, 866 (S.D.1985), Cyndy has submitted an itemized request for appellate attorney fees in the amount of $4,926.35. Although she requests an additional sum of $2,554.74 in costs, she has not offered an itemized statement of these costs.

[¶ 45] In deciding whether a party is entitled to appellate attorney fees, we consider the " 'property owned by each party, their relative incomes, the liquidity of the assets, and whether either party unreasonably increased the time spent on the case.' " *Beermann v. Beermann,* 526 N.W.2d 127, 131 (S.D.1995) (quoting *Abrams v. Abrams,* 516 N.W.2d 348, 352 (S.D.1994)). Considering these factors in conjunction with the facts of this case, we determine that each party shall be responsible for their own attorney fees.

[¶ 46] MILLER, C.J., and KONENKAMP, J., concur.

[¶ 47] AMUNDSON, J., concurs in result on Issue 1.

[¶ 48] SABERS, Justice, concurs in part and dissents in part.

AMUNDSON, Justice (concurring in result on Issue I).

[¶ 49] In *Ochs v. Nelson,* 538 N.W.2d 527, 530–31 (S.D.1995), this court affirmed an award of child support of $1,733 for a three-year-old child without any showing of what the actual needs of the child were. I dissented in *Ochs* based on the lack of any evidence reflecting what the actual needs of this minor child were. *Id.* at 531–33 (Amundson, J., concurring in part and dissenting in part).

[¶ 50] Following *Ochs,* based on a $485,000 income of the father in this case, it would seem mathematically logical to extrapolate a child support obligation of $6,932 or more for the older minor children. On the other hand, the record in this case discloses a trial court that looked at the actual needs of the children and not whether mother needed a new car, what mother's credit card balance is, trips for mother, and other various and sundry wants of mother.

[¶ 51] Therefore, I find that this decision sends a clear message to the bar and trial judges that actual needs of a minor child are to be considered in setting child support.

[¶ 52] I concur on all other issues.

SABERS, Justice (concurring in part, dissenting in part).

[¶ 53] I would reverse and remand not only Issue 2 relating to insurance, but also Issues 1 and 3, relating to child support and alimony.

[¶ 54] The trial court's perspective was so narrow in determining child support and alimony that one would think it was allocating its own money. The Supreme Court approves and affirms despite Ed's gross annual income of $485,000. Maybe for South Dakota standards, this is so much money the court system is incapable of putting things in the proper perspective.

[¶ 55] The amount of child support determined by the trial court ($3,505) is only 8.7% of Ed's monthly income, which amount will terminate in 1999.

[¶ 57] After the first 6 months of alimony at $2,500 per month, the trial court set alimony at $1,000 per month for 5 years. $1,000 per month represents a mere 2.5% of Ed's monthly income.

[¶ 57] The trial court found that Cyndy "would be able to earn $25,000 per year within 3 to 5 years, after retraining and reentering the work force." Apparently, the trial court found this to be fair and the majority affirms. How can this be fair when under the best scenario for her, her annual income will be $25,000 and his annual income will probably be upwards of $485,000, which the trial court acknowledged:

> [T]he husband has a vastly superior earning capacity. At the present time he is earning approximately $485,000 per year and that can be expected to increase over the next twenty years. In contrast the wife is unemployed at the present time and after a period of training can be expected to earn only $20,000 with increases to $25,000 after three to five years. After that time it is unlikely that her earnings would increase any more than the rate of infla-

tion. There is a great disparity in the earning capacity of the parties.

The trial court, and the majority, attempt to justify the alimony award by noting Cyndy's additional income from investment of property distribution assets. This does not narrow the gulf between her income and Ed's income; on the contrary, the court ignores the fact that Ed, too, will realize an increased income from investment of his property distribution assets. "[T]he award of alimony [is] wholly inadequate in amount and duration, especially considering ... the permanent disparity in the earning ability of the two parties." *Johnson v. Johnson*, 471 N.W.2d 156, 165 (S.D.1991) (Sabers, J., concurring specially).

[¶ 58] The trial court was even more narrow in eliminating expenses for tennis and tennis tournaments from the family budget. It is obvious from the record that tennis activities constituted the major recreational, entertainment and social events for this family *all* year round. Tennis may seem like a luxury rather than a necessity from the perspective of an average South Dakota income, but not for this family. According to statute, the trial court must consider the actual needs *and* standard of living of the children:

> For a combined net income above the schedule in § 25-7-6.2, the child support obligation *shall* be established at an appropriate level, taking into account the actual needs and standard of living of the child.

SDCL 25-7-6.9 (emphasis added). That standard of living is not what we think it *ought* to be—it is the standard of living set by the parties themselves; what may seem extravagant to an outsider was commonplace in this family.

[¶ 59] For the trial court to make Cyndy's continued participation in Kelsey's tennis events contingent on her invading the capital of her property distribution is shortsighted from a family standpoint and lopsided from a financial standpoint. This prevents Cyndy from continuing the active and supportive role which she always played in her daughters' tennis activities. In contrast, Ed can choose to participate and contribute without ever even considering the need to invade the capital of *his* property distribution. It is not fair to unduly hamper Cyndy's support of the children's activities, when Ed can do so by simply expending pocket change.[6]

[¶ 60] I would reverse and remand as indicated above.

6. For example, approximately one week before trial, Ed bought a new automobile for Kelsey, then 14 years old:

Q. What kind of car did you select?
A. She selected a Nissan Pathfinder.
Q. And what did you pay for that car?
A. Traded in her, the convertible that she had, a used convertible, and paid $20,000.00.
Q. What was the total purchase price of that car?
A. Twenty thousand plus the trade-in of the Pontiac Sunbird, which I think had a trade-in value of, like, seven thousand something.

....

A. Anticipating that [Cyndy] will pay for the insurance out of the child support that I pay her.

In other words, the decision of the trial court and the majority sanctions and approves Ed's sole purchase of this car from marital funds while Cyndy is expected to cover the insurance from child support funds.

Ed can buy a 14-year-old girl a $27,000 car with marital funds with impunity which amount exceeds two years of alimony.