2001 SD 101

**Jorge A. ZEPEDA, Plaintiff and Appellant,**

v.

**Leslie Renee ZEPEDA, Defendant and Appellee.**

**Nos. 21737, 21755.**

Supreme Court of South Dakota.

Considered on Briefs May 29, 2001.

Decided Aug. 1, 2001.

---

10. Appellate counsel was not trial counsel.

R. Scott Rhinehart of Richard Rhinehart & Associates, Sioux City, IA, Attorneys for plaintiff and appellant.

David L. Reinschmidt, Colby M. Lessmann of Munger, Reinschmidt & Denne, Sioux City, IA, Attorney for defendant and appellee.

KONENKAMP, Justice.

[¶ 1.] In this divorce appeal, the father challenges the custody award of his son to the mother, alleging that the circuit court failed to adequately consider the guiding principles in *Fuerstenberg v. Fuerstenberg*, 1999 SD 35, 591 N.W.2d 798. From our review of the record, however, it is apparent that the circuit court carefully balanced these considerations in its decision. By notice of review, the mother appeals the denial of general alimony, rehabilitative alimony, and attorney's fees. We affirm on all issues because the evidence supports the rulings, and we find no abuse of discretion.

**A.**

[¶ 2.] Jorge and Leslie Renee Zepeda (Renee) met in 1986 while they were both students at Louisiana State University. They married on November 27, 1987. Both eventually earned bachelor's degrees. Jorge graduated from LSU with a degree in electrical engineering. Renee received her degree from the University of Alabama, after accumulating college credit at various institutions. Before completing her degree, she gave birth to the couple's only child, Jorgito, born November 6, 1996. Renee cared for Jorgito "during the daytime when [Jorge] was at work." After obtaining her degree, Renee stayed home to provide full-time childcare.

[¶ 3.] In November 1998, Jorge accepted a position with Gateway Computer Company, and the couple moved to Dakota Dunes, South Dakota. This position provided a substantial salary increase. Renee continued to stay at home with Jorgito. In her words, she accepted the "woman's role in the house." She "took care of the majority of attending to Jorgito, his feeding, cleaning, dressing, shopping for clothes for him, [and] buying food for him." Jorge's brother, who lived with the couple for a short time, substantiated her rendition for the most part.[1] Jorge recalled that he also spent a great deal of his free time playing with and educating Jorgito. Renee disputed Jorge's recollection, insisting that Jorge worked long hours and spent little time with his son either during the week or on the weekends.

[¶ 4.] After their move to South Dakota, marital difficulties began to emerge. According to Renee, Jorge was either "controlling" or he ignored her, choosing to "talk to his computer or the TV rather than [her]." For his part, Jorge became suspicious of Renee's activities on the Internet while he was at work. He installed software on their home computer to covertly monitor her keystrokes. What he discovered would become a focal point in the divorce proceedings. In trial, Renee admitted that from late July 1999 until sometime in October of that year she engaged in "highly erotic" discourse on Internet "chatrooms" with two different adult men.[2] These communications oc-

---

1. The parties gave contradictory testimony about who usually cooked in the evening and Renee's housekeeping aptitudes.

2. At trial and again in his brief, Jorge alleged that Renee engaged in "explicit cybersex internet conversations" with males under the age of 18. Jorge failed to introduce evidence at trial to support this allegation. Renee denied that any conversations with minors occurred. In his brief, Jorge cites to Plaintiff's Exhibit 24. This was simply a list of email addresses and ages. Renee testified that she did encounter some males under 18 when frequenting chat rooms dealing with "classic board games."

curred, in her estimate, perhaps "once a week."[3] She explained that "it was kind of enjoyable that someone was finding interest in me." But her infidelity was not confined to the Internet. Renee had sexual relations several times with another man in July 1999.[4] On one occasion, after sharing a bottle of wine, the two engaged in sexual intercourse in Renee and Jorge's apartment while Jorgito was sleeping.

[¶ 5.] Jorge sued for divorce in September 1999. As the precipitating cause, he blamed Renee's sexual affair along with her "cybersex" conversations. He believed that Renee's Internet use had become an addiction. In her answer, Renee also requested a divorce. Both Jorge and Renee sought temporary custody of Jorgito. Before the interim hearing, the couple was evaluated by psychologist, Dr. Matt Stricherz. Stricherz opined that "while not appropriate for the marriage," Renee's Internet use was not an addiction. Stricherz also noted that "[n]either [parent] has issues in their past that would indicate an inability to provide adequate care for the child. The father has his strengths. The mother has her strengths."

[¶ 6.] Following the hearing, the court granted temporary custody to Renee, with visitation for Jorge. The court placed express conditions on Renee. First, she was not to have "any men in her apartment or in her presence while the child [was] present." Second, she was to refrain from consuming alcohol. Third, she could not use the Internet throughout the duration of the divorce and custody proceedings unless required by her employment.

[¶ 7.] In February 2000, Jorge accepted a position with Dell Computer Corporation in Austin, Texas. His benefits included a $10,000 per year pay increase and a more flexible schedule. The parties agreed to modify Jorge's visitation. Every other Wednesday Jorge flew back to South Dakota and kept Jorgito from Wednesday through Sunday. Renee in no way hindered Jorge's ability to visit his son.

[¶ 8.] The divorce trial was held in August 2000. Jorge offered computer log-on records from August 1 through October 22, 1999. They showed a substantial amount of Internet use in the household. For example, the computer was logged on for up to seven hours a day in August 1999. These records do not indicate, however, which member of the household used the Internet or whether the computer was simply left logged-on.

[¶ 9.] The court heard testimony from a licensed independent social worker, Judy Conner, who had visited with all three members of the family. She described Jorgito as a very active child who spoke very well even at age two. She observed that he "appeared to be very attached to both of his parents." Conner found Jorge and Renee "to be very caring parents." She saw nothing "that raised a red flag ... or any kind of alarm." Dr. Stricherz's opinions coincided with Conner's. He had

---

3. The parties disagree on the amount of time Renee spent engaging in these conversations. In his brief, Jorge asserts that "Renee ... began spending substantial hours nearly every day pursuing illicit relationships on the internet with adult men." Jorge fails to cite the record to support his statement. At trial, he introduced log-on records for the home computer for August 1 through October 22, 1999. These records only indicate the time the computer was logged on. They do not show the activities engaged in during these time periods. Renee testified that she used the Internet for genealogy searches for her mother and often played games.

4. There is a dispute in the record about whether the parties agreed to an "open marriage," where each would be free to engage in intimate relations with other partners. The court made no findings on this.

re-evaluated Renee in July 2000 in an attempt to ascertain any behavioral changes since the temporary hearing. Stricherz reaffirmed that Renee had no Internet addiction and noted that his initial conclusion was supported by the absence of any substituted behaviors after her computer was taken away.[5] At trial, Jorge produced no evidence that Renee had engaged in any inappropriate conduct since the temporary hearing.

[¶ 10.] Jorgito has attended the same daycare facility since December 1999. One of the daycare providers confirmed Jorgito's strong attachment to his mother:

> When she brings him in every morning, he has his arms around her waist ... [a]nd he always hugs her goodbye and says goodbye ... She always turns back twice and waves goodbye, and he's always waiting for her to turn back again[.]

The same witness described Jorgito as "very intelligent" and "soft-hearted."

[¶ 11.] At the time of trial, Renee was working full-time for an agency that provides long term temporary employees to Gateway. With this position and another intermittent part-time position, Renee expected to earn between $25,000 and $26,000 that year. In her opinion, to obtain a better paying job she would need a master's degree in business administration. She had researched that possibility and its cost at the time of trial.

[¶ 12.] At the end of the trial, the court ruled from the bench, granting joint legal custody to the parents, with Renee retaining primary physical custody. Jorge was ordered to pay monthly child support of $899. The court denied Renee's claims for general alimony, rehabilitative alimony, and attorney's fees. In its written findings of fact and conclusions of law, the court held that Renee was a "fit parent who provides a stable environment, with commensurate continuity of care as well." Jorge appeals the custody decision on his assertion that the trial court failed to adequately consider Renee's misconduct and Jorgito's need to maintain contact with both parents.

## B.

### Child Custody

[¶ 13.] To decide a custody dispute, a court must consider the child's temporal, mental, and moral welfare. *See Fuerstenberg*, 1999 SD 35, ¶ 22, 591 N.W.2d at 806 (citations omitted). No precise formula exists for making a custody determination, but the decision should be balanced and methodical. *Id.* at ¶ 35. We recognize several "guiding principles" in weighing the evidence. *Id.* at ¶ 23. These considerations include parental fitness; stability; primary caretaker; child's preference; harmful parental misconduct; and separation of siblings. *See generally Fuerstenberg*, 1999 SD 35, ¶¶ 23–32, 591 N.W.2d at 806–10. A court is not bound to make a specific finding in each category; indeed, certain elements may have no application in some cases, and for other cases there may be additional relevant considerations. In the end, our brightest beacon remains the best interests of the child. *See Fuerstenberg*, 1999 SD 35, ¶ 23, 591 N.W.2d at 807. A trial court is in a better position to evaluate the facts, and its con-

---

5. Jorge offered testimony from Dr. Scott Pribyl, a psychologist. Pribyl thought there was a "possibility" that Renee had an Internet addiction. He testified that it appeared "there were times ... that her use of the Internet was impacting her sleep patterns and perhaps her ability to attend to the child." In its bench ruling, the court found Stricherz and Conner to be the more credible witnesses because they had actually met with the family. Pribyl's opinion was based solely on his review of documentary evidence.

clusions on a child's best interests will stand unless we find an abuse of discretion. *Price v. Price*, 2000 SD 64, ¶ 18, 611 N.W.2d 425, 430 (citations omitted).

[¶ 14.] Jorge argues that the court did not consider the importance of "maintaining contact with both parents." *See Fuerstenberg*, 1999 SD 35, ¶ 24, 591 N.W.2d at 807. In *Fuerstenberg*, we recognized that when considering parental fitness it is appropriate to explore a parent's "willingness to . . . encourage and provide frequent and meaningful contact between the child and the other parent." *Id.* The crux of Jorge's argument is that for financial reasons he will not be able to continue flying to South Dakota every other week. Jorge points to a statement made by Renee on cross-examination acknowledging that if Jorge were awarded custody, she would move to Texas to be close to her son. In Jorge's opinion, to ensure "maximum continuing contact" with both parents, he should be granted custody and Renee should be held to her word and move to Texas.

[¶ 15.] To accept this argument is to ignore our statement in *Fuerstenberg* that a court should not isolate one consideration to the exclusion of all others when making a custody decision. *See* 1999 SD 35, ¶ 31, 591 N.W.2d at 809. The court stated in its bench ruling that there was no evidence that "either parent [was] unfit." It found neither parent to have any "emotional, mental, or physical problem." Additionally, it recognized that both parents could adequately provide for the child, and it specifically noted that "[b]oth are willing to encourage and provide frequent and meaningful contact between the child and

the other parent." The court emphasized that Renee "had actually demonstrated [her] commitment to provide . . . meaningful contact with [the] child's father" by flexibly altering visitation arrangements after Jorge's move.

[¶ 16.] As suggested in *Fuerstenberg*, these matters were considered along with stability and continuity of care. In addressing stability, the court found that the child "[was] well adjusted and has been in the home and community." The court explained that the scales were about even, but the stability consideration made "just ever so slight a difference." Renee had a closer bond with Jorgito. Indeed, the court noted in its written findings of fact that Renee had been the primary caregiver. The court addressed each of the applicable considerations, and its ruling evinces a methodical balancing. It found that Renee was a fit parent who provided stability and continuity for the child.[6]

[¶ 17.] Jorge contends that the circuit court "improperly concluded that Renee's behavior did not detract from her future ability to parent." Generally, marital misconduct alone is not a controlling consideration when making a custody determination. *See* SDCL 25-4-45.1; *Kester v. Kester*, 257 N.W.2d 731, 734 (S.D.1977). However, when misconduct results in some demonstrable harm to the child, parental fitness becomes an issue. *Fuerstenberg*, 1999 SD 35, ¶ 31, 591 N.W.2d at 809 (citing *Madson v. Madson*, 313 N.W.2d 42, 43–44 (S.D.1981)). Harm is self-evident when misconduct occurs in the presence of a child mature enough to perceive it. *See*

---

6. Jorge cites *Jeschke v. Wockenfuss*, 534 N.W.2d 602 (S.D.1995), and similar cases in support of his argument that "maximum continuing contact" with both parents should outweigh all other considerations. In *Jeschke*, this Court recognized that placement with

a parent who attempts to alienate a child from the noncustodial parent and actively interferes with visitation is not in the child's best interests. *Id.* at 606–07. *Jeschke* is inapplicable to this case.

*Price,* 2000 SD 64, ¶ 42, 611 N.W.2d at 435 (citations omitted).

[¶ 18.] The trial court found different categories of marital misconduct and examined each one. Regarding Renee's Internet usage, the court believed that Dr. Stricherz was the more credible expert. Stricherz discredited the suggestion that Renee suffered an Internet addiction. The court believed Renee's testimony that she had abstained from Internet usage and erotic discourse since the temporary custody hearing. Although the court labeled such conduct "potentially harmful" and "appalling," it found no "demonstrable effect on [Jorgito]." In discussing the instance of sexual intercourse in the home while Jorgito was sleeping, the court again emphasized that Renee's conduct was reprehensible. The court concluded, however, that the child was not in Renee's direct presence, that he was monitored with a baby monitor, and that the incident was an isolated one. Consequently, the court found no harmful effect on the child. The court discounted allegations of excessive drinking based on the lack of evidence. All Renee's misconduct occurred in a three month time span from July to October 1999.

[¶ 19.] We review findings of fact deferentially, applying the clearly erroneous standard. *Fuerstenberg,* 1999 SD 35, ¶ 16, 591 N.W.2d at 804 (citing *Therkildsen v. Fisher Bev.*, 1996 SD 39, ¶ 8, 545 N.W.2d 834, 836). In Jorge's brief, he asserts that Renee was not candid with the trial court. In essence, he argues that the court erred when it failed to accept his version of the facts. It was obvious to the trial court, and it is obvious to us now, that Jorge is a dedicated and loving father. Indeed, the judge acknowledged that the custody decision was a close one. Yet, we are in no position to reweigh the evidence. Absent clear proof of error, we must defer

to the judge's firsthand perception of the witnesses and the significance the judge gave to their testimony. *Fuerstenberg,* 1999 SD 35, ¶ 22, 591 N.W.2d at 807 (citations omitted). Like the circuit court, we do not condone Renee's misconduct, but we cannot hold that the court was clearly erroneous when it ruled that the misconduct had no harmful effect on Jorgito. Finding no error or abuse of discretion, we affirm the circuit court's decision to award custody to Renee.

### C.

### General and Rehabilitative Alimony

[¶ 20.] Renee sought $10,000 in alimony a year for three years. She also asked for $17,263 in rehabilitative alimony to pursue a master's degree in business administration at the University of South Dakota. The court denied both requests. We review the circuit court's rulings on alimony under the abuse of discretion standard. *Urban v. Urban,* 1998 SD 29, ¶ 8, 576 N.W.2d 873, 875; *Albrecht v. Albrecht,* 2000 SD 54, ¶ 25, 609 N.W.2d 765, 772 (citations omitted). When applying this standard, we do not inquire whether we would have made the same decision. Instead, we decide only whether the circuit court could reasonably reach the conclusion it did in view of the applicable law and the circumstances of the case. *Olson v. Olson,* 1996 SD 90, ¶ 9, 552 N.W.2d 396, 399 (citations omitted).

[¶ 21.] The objective of general alimony is to provide necessities such as food, clothing, and habitation. *Urban,* 1998 SD 29, ¶ 7, 576 N.W.2d at 875. As the requesting party, Renee had to prove her need for support and Jorge's ability to provide it. *See id.* (citing *Fox v. Fox,* 467 N.W.2d 762, 767 (S.D.1991)). In deciding whether to award general alimony, a court must balance certain elements, including

the length of the marriage, the parties' respective earning ·capacities, the parties' financial conditions after the property division, their age and health, their station in life, and their relative fault in the failure of the marriage. *Price*, 2000 SD 64, ¶ 61, 611 N.W.2d at 437 (citations omitted).

[¶ 22.] A review of the record demonstrates that the circuit court considered each required element. The marriage lasted just over twelve years. Both parties were in their mid-thirties and in good health. Renee and Jorge agreed to an equal property division. The court properly considered alimony and property division together. *Evans v. Evans*, 1997 SD 16, ¶ 31, 559 N.W.2d 240, 247 (citations omitted). The court recognized that Jorge's and Renee's incomes were "vastly disparate," with Jorge earning three times as much as Renee. Yet, it also recognized that Jorge's present salary was a "relatively new acquisition" occurring after the parties' separation. The court emphasized that "each had stable employment and a middle class station in life" both before and after the separation. Indeed, at trial Renee described her present station in life as middle class.

[¶ 23.] In its bench ruling, the judge found that "both parties [were] truly at fault" and granted the divorce based on irreconcilable differences. The court also found that Renee's use of the Internet for sexual discourse and her infidelity in the marital home was "appalling." Her erotic colloquies on the Internet were "inappropriate for the marriage" and were part of the impetus behind Jorge's decision to seek a divorce. Marital infidelity can be considered when awarding or denying alimony. *Evans*, 1997 SD 16, ¶ 33–34, 559 N.W.2d at 248.

[¶ 24.] Renee contends that the court erred in finding that she and Jorge had equal educational levels. Although both possess a bachelor's degree, Renee believes that "Jorge's electrical engineering degree is a specialized degree." At trial, there was no showing that Renee will suffer some financial detriment because of the divorce. With her bachelor's degree in business administration, she is gainfully employed. The couple's property was evenly divided. *Cf. Urban*, 1998 SD 29, ¶ 11, 576 N.W.2d at 876. Had we been sitting as trial judges, we might have given greater weight to the disparity in earnings and awarded some alimony, but under these facts, we cannot say that the circuit court abused its discretion.

[¶ 25.] When assessing a request for rehabilitative alimony, the court must consider (1) the supporting spouse's contributions, (2) the forgone opportunities to enhance or improve marketable skills, and (3) the duration of the marriage following completion of the non-supporting spouse's education. *Albrecht*, 2000 SD 54, ¶ 25, 609 N.W.2d at 772 (citations omitted). An essential prerequisite to recovering rehabilitative alimony is proof of an educational need and a plan to meet that need. *Urban*, 1998 SD 29, ¶ 13, 576 N.W.2d at 876–77 (citing *Evans*, 1997 SD 16, ¶ 35, 559 N.W.2d at 248–49).

[¶ 26.] Renee insists that she adequately "described her educational plan at trial." She explained that a master's degree in business administration will enhance her employability and earning capacity and make up for her lack of workplace experience. She obtained her bachelor's degree during the marriage. As the trial court recognized, she was gainfully employed and enjoyed a middle class station in life. While Renee's plan to enhance her earning capacity is commendable, she has not demonstrated that additional training is required for her to become self-sufficient. *See Albrecht*, 2000

SD 54, ¶¶ 26–27, 609 N.W.2d at 772–73. The circuit court did not abuse its discretion when it refused rehabilitative alimony.

D.

**Attorney's Fees**

[redacted] [¶ 27.] At trial, Renee requested $12,101 in attorney's fees. She testified that she did not have this amount available and that her income was too low to earn it. The court denied Renee's request, ruling that each party should be responsible for their own fees. We review the circuit court's denial for abuse of discretion. *Whalen v. Whalen*, 490 N.W.2d 276, 284 (S.D.1992)(*modified on other grounds* ) (citations omitted).

[redacted] [¶ 28.] In deciding whether to award attorney's fees, a court may consider the property each party owns; their relative incomes; the nature of their assets, fixed or liquid; and whether either party unreasonably prolonged the divorce. *See Schwab v. Schwab*, 505 N.W.2d 752, 756 (S.D.1993)(citing *Radigan v. Radigan*, 465 N.W.2d 483, 487 (S.D.1991)). These are the same elements we review when we consider a request for appellate attorney's fees. *See Wolff v. Weber*, 1997 SD 52, ¶ 14, 563 N.W.2d 136, 139–40 (citations omitted).

[redacted] [¶ 29.] In its findings, the circuit court recognized that neither party possessed property of any significance. All assets liquid or fixed were equally split. The court noted that both parties "aggressively sought custody," but did not find that either party had unreasonably prolonged litigation. The court acknowledged that Jorge earned a substantially higher income, but all other matters being equal, it denied an award of attorney's fees. We cannot hold that the circuit court's ruling was clearly against reason, and thus we affirm its decision.

[redacted] [¶ 30.] Renee has also requested appellate attorney's fees. Accompanying her request is an itemized statement as required. *Wolff*, 1997 SD 52, ¶ 14, 563 N.W.2d at 139 (citations omitted). Although the facts presented a close question, Jorge appealed this case knowing that well-established law governed the issues. Consequently, Renee was required to expend additional time and financial resources. Considering these matters together with the large difference in the parties' income, we award appellate attorney's fees to Renee of $2500.

[¶ 31.] Affirmed.

[¶ 32.] MILLER, Chief Justice, and AMUNDSON and GILBERTSON, Justices, concur.

[¶ 33.] SABERS, Justice, dissents.

SABERS, Justice (dissenting).

[¶ 34.] The trial court failed to make a reasoned and proper consideration of the evidence presented at trial concerning Renee's need for alimony and, therefore, abused its discretion. I dissent on issue C, general and rehabilitative alimony, because the trial court erred in not awarding *any* alimony. The trial court's findings on this issue are wholly inadequate:

Alimony

35. [Renee] testified regarding her financial need for permanent alimony for three years in the amount of $10,000 per year.
36. [Renee] further testified regarding her financial need for rehabilitative alimony to commence a Masters in Business Administration.
37. [Renee] testified regarding her intent to start a Masters in Business Administration at the University of

South Dakota as soon as possible, but likely not until fall 2001.

38. The cost of the MBA program is approximately $10,263.33, plus additional costs of $2,000 for books and $5,000 for transportation.

39. [Jorge] and [Renee]'s incomes are vastly disparate, with [Jorge] earning approximately three times as much as [Renee].

40. [Jorge] and [Renee] made a joint decision during their marriage that [Renee] should stay home to care for the minor child.

41. I award no permanent or rehabilitative alimony.

This conclusory statement is not a reasoned consideration of the factors required in any alimony decision. *See Peterson v. Peterson*, 2000 SD 58, ¶ 9, 610 N.W.2d 69, 70. A proper consideration of these factors justifies an award of alimony on this record.

[¶ 35.] Renee expected to earn a living of approximately $25,000 to $26,000 per year. She was accomplishing this modest amount by working two jobs while caring for her child. One of those jobs was an intermittent part-time position. In contrast, Jorge was earning three times as much at one job. The trial court found both parties at fault for the divorce, not just Renee. The parties had been married for twelve years, and during this time Renee was displaced from the competitive job market by mutual decision. That should not result in an automatic denial of alimony. Likewise, Renee's statement that she considered her lifestyle to be "middle class" does not negate alimony.

[¶ 36.] It was an abuse of discretion for the trial court to award no alimony on these facts. In my view, the trial court should have awarded at least $400 per month for the next three years. Therefore, I dissent on issue C.