740 So.2d 1181 (1999)
George HANNON, Sr., Appellant,
v.
Lorain A. HANNON, Appellee.
No. 98-2762.
District Court of Appeal of Florida, Fourth District.
June 2, 1999.
Rehearing Denied September 28, 1999.
*1182 Melinda Penney Gamot of the Law Office of Gamot, Freeman & Supran, West Palm Beach, and Jane Kreusler-Walsh of the Law Office of Jane Kreusler-Walsh, West Palm Beach, for appellant.
Linda L. Perry of the Law Office of Linda L. Perry, P.A., Boca Raton, for appellee.

EN BANC
FARMER, J.
Principles are bedeviled by facts, and in this case the bedevilment is exquisite. This is a second marriage of some 16 years in duration. The parties are in advanced years, he in his mid-90's, she in her mid-80's. Before they married, they concluded an agreement in which each disclaimed any interest in the other's separate property; but without mentioning alimony he agreed to support her during the marriage in the style he established for himself. After their wedding he paid all their living expenses. Although she retained her own premarital property, he conveyed to her an interest in his premarital condominium and placed her name on the title to a new automobile.
He suffered a stroke over a year ago, whereupon she left him to go live in Cape Cod. When he was discharged from the hospital he had one of his sons drive him up to Cape Cod to resume their life together. But she refused to let him stay with her, saying that she would not and could not take care of him. He ended up staying with one of his children for a while and then moved into an assisted living facility. She later rebuffed another attempt to live together. Recently he has been diagnosed with cancer and his life expectancy is thus shortened.
The evidence indicates that, aside from his interest in the jointly owned condominium and automobile, he has a nonmarital net worth of just over $520,000, about $475,000 of which is liquid. On a monthly basis, he receives $878 from Social Security and $2,100 from his investments. The assisted living facility alone currently costs him $2,300 monthly, so he is required to invade his investment capital just to pay his recurring living expenses.
When they married she was retired and apparently had little more in income then than she has today. She gets $809 monthly from Social Security and some interest income from a CD, the amount of which is not stated. She lives with her adult son and admittedly pays no rent or expenses. That she incurs little or no expense for housing and the basics is evidenced by the fact that when the parties separated she had $6,000 in a checking account and just before trial that amount had grown to $10,000.
The agreement before marriage contains the following operative provisions:
"[She] does hereby agree that from and after [his] marriage to her, [he] shall be and continue to be completely independent of her as regards the enjoyment and disposal of all of his independent owned property belonging to him at the commencement of their marriage *1183 and acquired by him during her marriage to him, and that all property shall be held and enjoyed by him and subject to his disposition as his separate property, in a manner as if the proposed marriage had never taken place. Such separate property acquired by him during the marriage shall include earnings and accumulations therein acquired during their marriage. The parties retain their respective rights to create interests or rights in the other by joint tenancy.
. . .
"[She] does hereby waive and release any right which she may have as surviving spouse under the laws and statutes of any jurisdiction, irrespective of whether such laws or statutes are now in force or whether hereinafter to be enacted or in force of [sic] the date of death, to elect to take against any will and testament of [him], whether heretofore or hereinafter made, to share in any way in his estate, or to act as the legal representative of his estate, all regardless of the size of his estate or the terms of his will.
. . .
"[He] agrees to support [her] during their marriage in a manner which is consistent with the standard of living of [him] from time to time during their marriage."
He made reciprocal engagements as regards her separate property. The agreement explicitly provides that he has the right to dispose of his separate property during his life and at its end by will or devise to anyone and to disinherit her entirely. She in turn gave up any right she would have under Florida law as a surviving spouse, including the right to elect against his will or to share in his estate in any way. Consequently, if divorce had not intervened and he had simply passed away leaving no provision for her, she would have no claim on his estate for support.
She did not attack the premarital agreement. The trial court left it undisturbed in the final judgment, and so it remains in full force and effect.
The amended final judgment entered July 30, 1998, contains the following with regard to lump sum alimony, the subject of this appeal:
"After an evaluation of all factors affecting alimony, conducted in accordance with the requirements of F.S. 61.08(2), the court specifically finds as follows ...
D. The Husband's financial affidavit reveals a net worth in excess of $600,000. The Wife's net worth is $44,250. The Wife's total net income does not meet her expenses and she has no other income or source of support.
The Husband clearly has the ability to meet an award of lump sum alimony without substantially endangering his own economic status. Kuharsky v. Kuharsky, 582 So.2d 78 (Fla. 4th DCA 1991).
. . .
F. The Husband shall pay to the Wife in and for lump sum alimony the amount of $92,736 (her monthly deficit times 12 times 4 years) which said payment shall be made on or before August 1, 1998."
In addition, the trial judge gave her half the ultimate net proceeds from the expected sale of the condominium (her share, approximately $37,500-$42,500); half the value of the automobile ($4,500); and all of her attorney's fees. The sale proceeds are really greater than half because he was ordered to pay all carrying costs with no right of recoupment from the sale before the division of proceeds. The only source of funds to pay the lump sum and attorneys fees is the husband's separate property. He thus argues that in effect through the lump sum alimony the trial judge has awarded her a portion of his separate property in which she had expressly disclaimed any interest.
It is important to note at the beginning that, as we have already suggested, the record does not support the findings in *1184 paragraph D. The uncontradicted evidence establishes that his personal net worth is actually not greater than $520,000. Moreover, the finding in paragraph D that he "clearly has the ability to meet an award of lump sum alimony without substantially endangering his own economic status" lacks any evidentiary support in the record as regards his own economic burden for health care at this critical time. At the same time the record shows that her income more than meets her expenses because she admittedly does not have any. She lives rent free with her son, she says, and has no obligation to pay for much of anything. Finally, the trial court's calculation ("her monthly deficit times 12 times 4 years") of the amount of the lump sum ($92,736) is obviously based on her expected lifetime.
The principle bedeviled by the facts in this case is the general rule on lump sum alimony. The right to lump sum alimony in dissolution of marriage cases is now rooted in Florida statutory law. Section 61.08(1) provides:
"In a proceeding for dissolution of marriage, the court may grant alimony to either party, which alimony may be rehabilitative or permanent in nature. In any award of alimony, the court may order periodic payments or payments in lump sum or both. The court may consider the adultery of either spouse and the circumstances thereof in determining the amount of alimony, if any, to be awarded." [emphasis supplied]
Thus by its express terms as a general matter this statute authorizes the use of both lump sum and periodic alimony. Although the legislature has not required lump sum alimony, as such, when any specific set of circumstances is shown, in section 61.08(2) it has listed a number of factors relating to alimony awards generally, the last of which is "any other factor necessary to do equity and justice between the parties." All things considered, it can be fairly said that the evident purpose of the legislature in providing for statutory alimony is "to do equity and justice between the parties," leaving it to the courts to define just what constitutes equity in cases brought under the statute.
Although the power of the trial court to order alimony is now codified in section 61.08, it actually originated in the common law, where the rule was that alimony terminated upon the death of the payor. O'Malley v. Pan American Bank of Orlando, 384 So.2d 1258 (Fla.1980); Aldrich v. Aldrich, 163 So.2d 276 (Fla. 1964). Hence, as the court explained in O'Malley, "the well established rule is that an obligation to pay alimony ceases upon the death of the obligor, unless that person expressly agrees that the estate shall be bound to continue to pay alimony after his death." 384 So.2d at 1260; see also In Re Estate of Freeland, 182 So.2d 425 (Fla. 1965); Allen v. Allen, 111 Fla. 733, 150 So. 237 (1933). Clearly there is nothing in the agreement in this case suggesting that the husband's estate would continue to pay alimony beyond his death, much less expressly so stating.
In Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980), the court addressed the proper use of lump sum alimony in the trial judge's arsenal of remedies. That case involved a long term marriage and the accumulation of considerable wealth from the husband's medical practice. The trial court awarded two forms of lump sum alimony: one was the husband's interest in a jointly owned residence in which the wife was living, while the other was $50,000 for support. The district court reversed only the award of the residence because of the lack of any record evidence of a "special equity" in it. The supreme court thus reviewed only the lump sum award of the residence.
In beginning its discussion of the issue the court observed that it was important for appellate courts to "avoid establishing inflexible rules that make the achievement of equity between the parties difficult, if not impossible." After then *1185 discussing the proper meaning and role of the term "special equity" in effecting an equitable distribution of marital property, the court stated:
"In granting lump sum alimony, the trial court should be guided by all relevant circumstances to ensure `equity and justice between the parties.' § 61.08, Fla.Stat. This Court recognized in Yandell v. Yandell [39 So.2d 554 (Fla.1949)] the broad scope of the trial judge's discretion in granting lump sum alimony, consistent with the statutory mandate. The `special equities' referred to in Yandell concern only the general equities of the case. We stated in Yandell:

(O)rdinarily ... a lump award should be made only in those instances where some special equities might require it or make it advisable; for instance, where the wife may have brought to the marriage, or assisted her husband in accumulating, property.... There may be other situations which might justify or possibly require a lump sum award. ... A lump sum allowance of permanent alimony is not `fit, equitable and just' unless the husband is in a position to make payment of the sum so granted over and above the requirements attendant upon the maintenance of his business or employment....
(W)here the husband's financial condition is such as to enable him to respond to a gross allowance of alimony without jeopardy to his business, profession or employment it may be the better solution to grant such allowance when all other equitable considerations justify it. ...
39 So.2d at 556-57 (citations omitted) (emphasis supplied). Yandell /clearly does not limit the use of lump/sum alimony to instances of support or vested property interests. A judge may award lump sum alimony to ensure an equitable distribution of property acquired during the marriage, provided the evidence reflects (1) a justification for such lump sum payment and (2) financial ability of the other spouse to make such payment without substantially endangering his or her economic status." [e.o.]
382 So.2d at 1201. The court went on to note that, although an existing vested interest is not as a general matter necessary for an award of lump sum alimony intended for support purposes, the fact of granting a lump sum award in the final judgment itself actually creates a vested right in the receiving party "which is neither terminable upon a spouse's remarriage or death nor subject to modification." 382 So.2d at 1201. Thus in awarding a lump sum alimony for support purposes the court is effectually deciding that the particular amount awarded should not be modified or terminated; instead it should be made absolutei.e., placed beyond the powers of the trial judge to change it.[1]
Yandell v. Yandell, 39 So.2d 554 (Fla. 1949), discussed in the Canakaris opinion, involved an award of permanent alimony for support that was payable in a single lump sum. The question confronted by the court was "whether ... where the evidence fails to disclose that the wife contributed to the accumulation of the property of the husband and further fails to show that the husband has sufficient property or a source of income which would justify a lump sum allowance of alimony, it is `fit, equitable and just' to grant alimony in a lump sum to the wife." 39 So.2d at 556. The court then explained:
"`Where an award of alimony or allowance may be either in gross or by periodical payments, it has been said that ordinarily the better method of awarding alimony is by an annual allowance payable at such intervals as may best suit the convenience of the husband and meet the demands of the wife, to the *1186 end that the court may retain its power to modify the alimony provision as circumstances may warrant in the interest of justice to both parties. Such an award rather than one for a lump sum is often held proper, particularly where the divorce is not absolute or where the husband's present estate or property is so small as to render inadequate the award of any portion of it as a full and final award of alimony. On the other hand, it has been held to be proper and the better practice, at least with respect to some situations, to award alimony in gross, as where the divorce is an absolute one, restoring the parties to the state of unmarried persons, or where, there being no children, the lives of the parties will diverge, where the wife has brought money or property to the husband, or where property has been accumulated by the joint efforts of the husband and wife. In the final analysis, the question of whether or not an allowance of a gross sum should be made must be determined by the facts of the particular case, having due regard to the best interest of the parties and the husband's financial ability to respond to an award in gross. Where alimony in gross is awarded, it is especially important that every fact material to the determination of a just award should be before the court, and it has been held that an award in gross cannot be made in the absence of proof of the wife's age and expectation of life. Where a decree awards an allowance in gross, the right to the amount so fixed, even though it is made payable in installments, becomes vested in the wife, and the obligation of the husband to pay it has every element of finality.
"We are constrained to the view that ordinarily the better practice is to direct periodic payments of permanent alimony and a lump award should be made only in those instances where some special equities might require it or make it advisable; for instance, where the wife may have brought to the marriage, or assisted her husband in accumulating, property and where it is clearly established that the husband has assets sufficient in amount to pay the gross award. State ex rel. Tong v. District Court, etc., 109 Mont. 418, 96 P.2d 918, 921; Martin v. Martin, 195 Ill.App. 32. There may be other situations which might justify or require a lump sum award, but it should never be made unless the husband is in a financial position to make payment of such gross award without endangering or actually impairing his economic status. A lump sum allowance of permanent alimony is not `fit, equitable and just' unless the husband is in a position to make payment of the sum so granted over and above the requirements attendant upon the maintenance of his business or employment, or the preservation of his professional activities.
"Of course, where the husband's financial condition is such as to enable him to respond to a gross allowance of alimony without jeopardy to his business, profession or employment it may be the better solution to grant such allowance when all other equitable considerations justify it and thereby avoid vexatious and possibly endless litigation. [emphasis supplied]
39 So.2d at 556-557. The court then concluded from the record that there was no evidence showing that the husband was able to pay the lump sum without "destroying his small estate and encumbering his anticipated income for a limitless period of time if, indeed, it would be possible for him to make such a payment at all." 39 So.2d at 557.
To be sure, the present case differs from Canakaris in that the lump sum here was not awarded as a division of property, and the only special circumstances are the advanced age of both parties and the imminency of his death. Instead this particular lump sum is described as providing the recipient with supportand for a period long after the payor's death, when alimony *1187 would otherwise terminate. Yet there is nothing in section 61.08 or, for that matter, in Canakaris that explicitly approves the use of lump sum alimony for the purpose of reaching beyond the payor's expected demise.
Passing beyond Canakaris to Yandell, we also find scant support for the specific use of lump sum involved in the present case. Although Yandell does mention the propriety of lump sum support when there are no children and the intent is that the lives of the parties will diverge, as here, the opinion goes on to make clear that the better practice is to award periodic payments unless the evidence establishes that the payor can bear the lump sum "without endangering or actually impairing his economic status." 39 So.2d at 556.
As we have already indicated, there is no evidence in the record thatin the words of the Final Judgmenthe "clearly has the ability to meet an award of lump sum alimony without substantially endangering his own economic status." Rather, the evidence is silent as to whether he can transfer the gross sum to her without thereby jeopardizing his own ability to pay for the extraordinary medical care and expenses associated with his very serious illness. More importantly, there is nothing in this agreement, in the statute or in the cases that would authorize the use of lump sum to effect a transfer of nonmarital property in which the transferee has expressly disclaimed any interest.
It must also be stressed that neither Canakaris nor Yandell involves a premarital agreement renouncing all claims to the payor's separate property and its consequent effect on the general power of the court under section 61.08 to award lump sum alimony. The question is whether the advanced age and imminent death of the payor are circumstances authorizing an award of lump sum alimony for the balance of the payee's life and beyond the payor's where the parties have agreed to waive any interest in the other's separate property and the payor has agreed to support the payee only during the obligor's lifetime.
As we have seen, lump sum may be employed for equitable distribution of property, as well as for support. But the mere fact that it is available for both surely does not mean that a court can defeat the renunciation of property in an antenuptial agreement simply by shifting the label of the lump sum award from distribution of property to support.
A primary purpose of an agreement is to modify or shrink the general discretion of the dissolution of marriage judge in doing equity between the parties. The agreement itself is intended to define the mutual equities, and the trial judge is not free to ignore its provisions or to render them ineffective. As a general matter, the provisions in chapter 61 on alimony do not exist to displace nuptial agreements; rather the statutes exist to set the principles when there is no agreement. Dissolution of marriage courts should attempt to give effect to nuptial agreements that are, as here, properly made and fully enforceable.
The foregoing analysis is vexed by our own decisions in Cladis v. Cladis, 512 So.2d 271 (Fla. 4th DCA 1987), and Ryland v. Ryland, 605 So.2d 138 (Fla. 4th DCA 1992), both of which broadly state that a party who has by agreement relinquished any claim to the other's nonmarital property can nonetheless still be awarded lump sum alimony at the discretion of the trial court. In these cases, as in the current one, an agreement disposed of any right to the other's individual property but made no mention of alimony. While these decisions do, quite rightly, add that such an award of lump sum alimony cannot be used to achieve an equitable distribution contrary to the terms of such an agreement, they appear by their holdings and broad language to suggest that lump sum is still generally available in spite of the agreement separating property.
*1188 In recognizing that a contracting party who has renounced any interest in the other's property may nevertheless maintain a claim to lump sum alimony, we find it necessary to make clear that the agreement cannot be treated as though it has no limiting effect on the power of the trial judge to award lump sum alimony. Any such award must be carefully restricted in its amount so that it does not appear to contradict the terms of the contract. Where as here the agreement expressly waives any right to the payor's separate property both during his lifetime and after death as well, and where as here the agreement of support is carefully constricted to only the payor's lifetime, any lump sum would have to avoid the effect of transferring his property to the recipient and confine any alimony to the recipient's lifetime. Thus the intent of the parties' agreement in this case is to shrink the use of an award of lump sum to support only to carry out the contractual promise to support her during his life. To the extent that Cladis and Ryland appear to suggest otherwise by their facts and holdings, we hereby recede from them.[2]
In the final analysis we conclude that the award of lump sum support for the period beyond the death of the payor in this case affords insufficient attention to the obvious meaning of the premarital agreement. The recitations in the agreement establish that this was a second marriage between parties with grown children and separate property that each intended to leave for these children from their first marriages. It is also clear that the agreement provides that he would support her only during his lifetime, in that it fails to specify an intent that his separate property would nevertheless be available after his demise to continue supporting her if she should survive him. Hence, while we agree that there is evidence in the record that would authorize an award of alimony to her, to be consistent with the agreement the alimony should be limited to his lifetime and not extended by hers.[3]
To the extent that she seeks support to continue living according to the standard achieved during the marriage, we agree that she is certainly entitled to periodic alimony.[4] Any periodic alimony should be limited, however, to the traditional requirement of alimony terminating upon the death of the payor or the remarriage of the payee. O'Malley, 384 So.2d at 1258; Aldrich, 163 So.2d at 276.
As the trial court abused its discretion in awarding the lump sum to the wife, we reverse and remand with instructions to conduct such further proceedings as are consistent with our decision today.
STONE, C.J., DELL, GUNTHER, WARNER, POLEN, STEVENSON, SHAHOOD, GROSS, TAYLOR, and HAZOURI, JJ., concur.
KLEIN, J., recused.
NOTES
[1] See § 61.14(1), Fla. Stat. (1997) (alimony generally modifiable when circumstances or financial ability of either party changes).
[2] Our decision in Pollack v. Pollack, 517 So.2d 707 (Fla. 4th DCA 1987), rev. denied, 528 So.2d 1183 (Fla.1988), is distinguishable on its facts. There was no waiver of separate property in an antenuptial agreement in Pollack as there is in this case and in Cladis and Ryland.
[3] In Yandell, the court observed in dictum that prior cases had held that "an award in gross cannot be made in the absence of proof of the wife's age and expectation of life." 39 So.2d at 556. Because Yandell did not involve an agreement renouncing any right in the separate property of each other and any claim in the other's estate after death, as this case does, the dictum just quoted does not require or authorize alimony in this case to be measured by the payee's expected life.
[4] We know of no reason from this record why periodic alimony could not be retroactive to the date of filing.