2005 SD 63

**Mark D. FAUSCH, Plaintiff and Appellant,**

v.

**Zelmira P. FAUSCH, Defendant and Appellee.**

**No. 23316.**

Supreme Court of South Dakota.

Considered on Briefs April 25, 2005.

Decided May 18, 2005.

Michael B. Crew, Karen L. Crew of Crew & Crew, Sioux Falls, SD, for plaintiff and appellant.

Catherine V. Piersol, Piersol Law Office, Sioux Falls, SD, for defendant and appellee.

MEIERHENRY, Justice.

[¶ 1.] This is a divorce action between Mark Fausch and Zelmira Fausch. On December 22, 2003, a partial Judgment and Decree of Divorce was granted to both parties on grounds of extreme cruelty. On May 5, 2004, an Amended Judgment and Decree of Divorce was entered which resolved the issues of property division, debt division, alimony and attorney fees. There are three points of dispute on appeal. First, Mark contends that the trial court's failure to apply a lack of marketability discount to his business interests in three companies resulted in a clearly erroneous valuation. Second, Mark contends that the valuation of the third business based on his capital contribution to the business was clearly erroneous. Third, Mark contends that the award of alimony was an abuse of discretion because it was based on erroneous findings concerning Zelmira's need for alimony. We affirm.

## FACTS

[¶ 2.] Mark and Zelmira were married on December 5, 1980. During the marriage, they had three children, all of whom had reached the age of majority at the time of the divorce. Mark is a physician and Zelmira has mainly been a full time wife and mother during the marriage. Mark is working as an interventional cardiologist with North Central Heart Institute and earning approximately $400,000 annually. He is 53 years old and in good health. Zelmira is 56 years old and suffers from hyperthyroidism, type two diabetes and divorce-related depression.

[¶ 3.] The parties moved to Sioux Falls, SD in 1997 when Mark accepted a position as a cardiologist at North Central Heart Institute P.C. (NCH Institute). At that time, NCH Institute was affiliated with Sioux Valley Hospital. NCH Institute later severed its affiliation with Sioux Valley Hospital and entered into an agreement with Avera McKennan Hospital and a company called MedCath to build and operate a specialty hospital, Heart Hospital of South Dakota, in which each business entity was a one-third owner. Mark is a minority owner of NCH Institute.

[¶ 4.] In connection with these changes, the partner-owners of NCH Institute created three separate business entities: North Central Heart Real Estate, LLC (NCH Real Estate), Medical Development, LLC, and North Central Heart Institute Holdings, LLC (NCHI Holdings). NCH Real Estate owns the building and land occupied by NCH Institute's clinic operations in addition to approximately 10 acres of bare land. Medical Development owns two parcels of land adjacent to the land owned by NCH Real Estate. NCHI Holdings was formed to hold NCH Institute's one-third ownership interest in the Heart Hospital of South Dakota. Mark is a minority owner in each business, having ownership interests ranging between 5% and 7%. Various other owners/members of

NCH Institute hold the remaining interests in the companies.

## ISSUES

I. Whether the trial court was clearly erroneous in its valuation of Mark's interest in three companies in which he was a minority owner.

II. Whether the trial court's division of the marital property was an abuse of discretion.

III. Whether the trial court's finding that Zelmira needed an alimony award of $8,000 per month is supported by the evidence.

## STANDARD OF REVIEW

■■■ [¶ 5.] "[T]he valuation of property involved in a divorce proceeding will not be overturned unless it is clearly erroneous." *Priebe v. Priebe*, 1996 SD 136, ¶ 8, 556 N.W.2d 78, 80. "Our standard of review of a trial court's property division is that of an abuse of discretion." *Grode v. Grode*, 1996 SD 15, ¶ 6, 543 N.W.2d 795, 799 (quotations and citations omitted). "The term 'abuse of discretion' refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." *Id.* ¶ 6, 543 N.W.2d at 800 (quotations and citations omitted). A trial court's alimony award is also reviewed under the abuse of discretion standard. *Urban v. Urban*, 1998 SD 29, ¶ 8, 576 N.W.2d 873, 875.

*Valuation of Business Interests*

[¶ 6.] During the divorce proceedings, the parties stipulated to the value of Mark's interest in NCH Institute but disagreed as to the value of the three related businesses. Each party retained an expert to determine these values. On appeal, the valuation dispute regarding two of the entities, NCH Real Estate and Med-

ical Development, is over the trial court's failure to apply a lack of marketability discount to Mark's interests in these businesses. The valuation dispute over the third business, NCHI Holdings, involves the trial court's rejection of the value as determined by a "buy-sell" provision in the company's operating agreement. Instead, the trial court used the higher figure of Mark's capital contribution as the value of his interest in the company.

*Lack of Marketability Discount*

■■■ [¶ 7.] Both parties provided expert testimony as to the value of Mark's business interests. In valuing NCH Real Estate and Medical Development, the experts arrived at significantly different figures. A major part of the disparity between the values of the two experts was the application of a 25% marketability discount on the part of Mark's expert, Shelly Fossum, in comparison to 0% marketability discount used by Zelmira's expert, John Wenande. The trial court adopted the value of Zelmira's expert and did not apply a marketability discount. The reason for accepting the opinion of Zelmira's expert was explained in the trial court's decision as follows:

The valuation given to the property by defendant's expert Mr. Wenande made the most sense. Mr. Wenande based his opinion on a $3.00 per square foot valuation. This value was based on the fact that the entity had sold land to the Heart Hospital for $3.00 a foot in 1999, in 2002 had donated 4 acres to a charity and allocated $200,000 per acre or over $4.00 a square foot on its tax return, and had recently accepted an offer of $2.75 a square foot for some of the land. Mr. Wenande also testified that a 10% discount for lack of control should be given, but an additional 25% discount for lack of marketability was inappropriate in a divorce case where no sale is contem-

plated....Adjusting Mr. Wenande's numbers to take the taxes into account, I find Dr. Fausch's interest in NCH Real Estate LLC is worth $154,400.

Medical Development is an entity that owns land held for development. Accepting Mr. Wenande's values for the reasons stated above, I find Dr. Fausch's interest to be $175,000.

[¶ 8.] Mark argues that it was error for the court not to apply a marketability discount. Although acknowledging that a marketability discount may not always be appropriate, Mark claims that rejecting one in this case was error because of the underlying premise of Wenande's opinion. Wenande opined that it was not appropriate to apply the discount in a divorce case if the business was not going to be sold.[1] Mark argues that since the task of the expert is to determine and provide the fair market value of the business, an expert's opinion must establish the price at which a willing seller would sell to a willing buyer. If the price involves a discount for lack of marketability, Mark claims that the discount should be factored into the property valuation regardless of whether a sale of his interest is or is not intended.

[¶ 9.] We have acknowledged that fair market value is "the price a willing buyer would pay a willing seller, both under no obligation to act." *First Western Bank Wall v. Olsen,* 2001 SD 16, ¶ 17, 621 N.W.2d 611, 617. We have also approved of applying a discount in a divorce case where no immediate sale is contemplated. *See Priebe,* 1996 SD 136 at ¶ 19, 556 N.W.2d at 83 (affirming the application of a 40% minority discount in a divorce case). We stated in *Priebe* that "the determination of whether to apply a minority discount depends upon the evidence presented in each case. In other words, this is an issue that must be dealt with by trial courts on a case-by-case basis." *Id.* ¶ 17, 556 N.W.2d at 82. The relevant evidence in this context is whether a willing buyer would actually require a discount and to what degree.

[¶ 10.] In this case, the trial court found: "A 10% discount of lack of control should be given, but an additional 25% discount of lack of marketability is inappropriate in a divorce case where no sale is contemplated." If the trial court intended this as a legal conclusion applicable to all divorce cases, it is erroneous. We have not adopted a bright line rule prohibiting marketability discounting in a divorce case where a sale is not contemplated. Whether or not it is fair or appropriate to apply a discount in a divorce case where no immediate sale is contemplated is for the trial court to determine based upon the evi-

---

1. Wenande's report itself does not provide an explanation for the 0% lack of marketability discount. On cross examination, he gave the following explanation for not applying a discount:

> There is no clear cut rule from state to state or probably even from within the state from one courtroom to another. It is also a very debated topic in the valuation world at the National Business Valuation Conference last year, a CPA national conference. They devoted an entire session to a discussion on whether marketability discounts are appropriate in a divorce context and the issue—I don't want to get too technical—but the issue essentially revolves around fairness to the parties. If there is no sale involved, you can say that under the standard fair market value you are asked to consider lack of marketability discounts. Under fairness within a divorce context where there is no sale, is it fair to the nonowner spouse to have their marital estate reduced by a marketability discount.
>
> . . .
>
> I understand and could argue for a marketability discount but my own sense of a divorce standard, if you will, is not appropriate unless that interest is prospectively to be sold.

dence of the case. *Id. See also Hayes v. Hayes,* 756 P.2d 298, 300 (Alaska 1988) (where a witness "testified that no minority discount was appropriate in a divorce settlement context because generally there is no change of ownership," the Alaska court rejected this view as a matter of law); *Kalisch v. Kalisch,* 184 A.D.2d 751, 585 N.Y.S.2d 476, 479 (N.Y.App.Div.1992) (abrogated on other grounds by, *McSparron v. McSparron,* 87 N.Y.2d 275, 639 N.Y.S.2d 265, 662 N.E.2d 745 (1995)) (modifying a trial court's determination of the value of a husband's interest in a closely-held corporation because the trial court improperly failed to discount the value of the company to reflect the lack of marketability of its stock); *Bryan v. Bryan,* 222 Neb. 180, 382 N.W.2d 603, 606 (1986) (providing that a trial court may consider, among other things, the marketability of the shares when determining the fair market value of a business); *Matter of Marriage of Tofte,* 134 Or.App. 449, 895 P.2d 1387, 1392 (1995) (finding that it was proper to apply a lack of marketability discount regardless of whether husband intended to sell).

[¶ 11.] Nonetheless, since we review a trial court's valuation under a clearly erroneous standard, we must determine, in this instance, if the failure to apply a marketability discount to Mark's interest was error. We have said that the fair market value is "the price a willing buyer would pay a willing seller, both under no obligation to act." *First Western Bank Wall,* 2001 SD 16 at ¶ 17, 621 N.W.2d at 617. Here, the experts disagreed. Mark's expert testified that any potential buyer of Mark's interests in the two businesses would demand a discounted price due to the minority status of the interests. She determined that a 25% discount would be appropriate. Zelmira's expert testified primarily as to his opinion that a discount was inappropriate or unfair in these situations. He also provided testimony as to

what, if any, discount a willing buyer would require. He stated:

> [I]f you did look at marketability discount, I would look at the number of people who are most likely willing and waiting to buy those interests, that being the other physicians who have money and reason to acquire interest in these properties.

He further explained that there were no restrictions on who may purchase the interests in the two businesses and that anyone could offer to buy them subject only to the entity's right of first refusal. He finally stated: "It would be an attractive investment and I would fully expect the doctors themselves would not want that to go outside of their group."

[¶ 12.] This testimony effectively rebuts the proposed application of a marketability discount. Consequently, there was evidence before the trial court that a sale of Mark's interest may not be subject to a marketability discount. We cannot say that the court's decision not to apply a discount is clearly erroneous. *See Christians v. Christians,* 2001 SD 142, ¶ 12, 637 N.W.2d 377, 380 ("Although a trial court is not required to accept either party's proposed valuation, the value must be within the range of evidence presented to the court.").

*Failure to Use the Buy Back Formula to Determine Value*

[¶ 13.] The parties also dispute the value of the third business, NCHI Holdings. The operating agreement of this company contains a "buy-sell" provision, which requires the company to buy out an owner that wants to sell his/her interest. This provision provides that the purchase price shall be determined by multiplying the book value of the company's assets, less liabilities and undistributed profits, times the member's sharing ratio. Mark claims the value of the com-

pany under the formula provided is $1,457,675. Mark's sharing ratio is 5.128205%. Therefore, under the formula, the amount that Mark would receive if his shares were sold back to the company would be $74,753. This was the valuation amount provided by Mark's expert. Zelmira's expert, however, concluded that Mark would likely receive the amount of his original capital contribution because the amount under the formula in the operating agreement was less than his capital contribution. His capital contribution was $93,256, and Zelmira's expert set that figure as the fair market value of Mark's interest. The expert's report explains this decision as follows:

> Use of the original capital contribution is based on a discussion with Kathy Haberling, administrator at NCHI, who indicated that an existing owner-physician would likely be paid no less than their original contribution.[2]

He further explained this in his testimony at trial by saying:

> I believe it is only common sense when a new doctor comes in today, they will have to put in as a contribution as a minimum what the original founding doctors put in and thus for [Haberling] to conclude that they would likely pay out that original contribution even if the book value computation was less, to me was only common sense.

He also stated that a buy-sell agreement "clearly is not designed to represent fair market value;" because if the entire business was sold not just one individual's interest the buy-sell formula would not apply.

[¶ 14.] Given Wenande's explanations, we cannot say the trial court's adoption of his valuation was clearly erroneous. Al-

though the agreement provided for a specific buy back price if Mark would choose to sell, the expert based his opinion on the hospital administrator's belief that Mark most likely would be paid his original capital contribution. In addition, the buy back provision would not apply in the event of a total sale of the business by all owners. Therefore, the valuation adopted by the trial court for Mark's business interest in NCHI Holdings was not clearly erroneous.

*Division of Property*

[¶ 15.] On appeal, Mark's assertion of error as to the trial court's division of property is based entirely upon his contention that the trial court's division of property relied upon erroneous asset valuations. We have found that the trial court's valuations were not clearly erroneous. A trial court's ultimate division of property is subject to the abuse of discretion standard of review. *Abrams v. Abrams,* 516 N.W.2d 348, 352 (S.D.1994). " 'The term 'abuse of discretion' refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.' " *Dacy v. Gors,* 471 N.W.2d 576, 580 (S.D.1991) (quoting *Gross v. Gross,* 355 N.W.2d 4, 7 (S.D.1984)) (additional citations omitted). The trial court made an equal division of the property. Therefore, we find that the trial court's division of the marital property was not an abuse of discretion.

*Alimony*

[¶ 16.] Mark also takes exception to the trial court's alimony award. Zelmira requested $9,500 per month in alimony. Mark testified that she would need only $5,000 per month. The trial court awarded $8,000 per month "[a]s Mrs. Fausch's budget shows a need of $10,000 a month and she has income of $2,000." Mark par-

---

**2.** There was testimony that as the NCH Institute's Clinic Administrator, Haberling handled many of the financial transactions of the business.

ticularly challenges certain items in Zelmira's budget.

[¶ 17.] The amount and length of alimony payments are left to the discretion of the trial court. SDCL 25–4–41 gives the court discretion to grant "suitable allowance" to a spouse, "as the court may deem just, having regard to the circumstances of the parties represented. . . ." The factors for a trial court to consider in exercising its discretion have long been established to include the following: "(1) the length of the marriage; (2) their respective earning capacity; (3) their respective financial condition after the property division; (4) their respective age, health and physical condition; (5) their station in life or social standing; and (6) the relative fault of the parties in the termination of the marriage." *Guindon v. Guindon*, 256 N.W.2d 894, 898 (S.D.1977). "General alimony is an allowance for support and maintenance, with 'its sole object the provision of food, clothing, habitation, and other necessaries for the support of a spouse.'" *Urban*, 1998 SD 29 at ¶ 7, 576 N.W.2d at 875 (quoting *Wilson v. Wilson*, 434 N.W.2d 742, 744 (S.D.1989)). A party requesting such alimony "'must establish that they have a need for support and that their spouse has sufficient means and abilities to provide for part or all of that need.'" *Id.* (quoting *Fox v. Fox*, 467 N.W.2d 762, 767 (S.D.1991)). "The trial court's decision regarding alimony will not be disturbed absent an abuse of discretion." *Id.* ¶ 8, 576 N.W.2d at 875.

[¶ 18.] In awarding alimony in this case, the trial court noted it was a long term marriage of 23 years. The trial court also found that Mark was receiving the appreciating business assets and would have a high income in the future. Zelmira, by comparison, was receiving assets which did not have appreciation potential and her earning capacity was limited because of her lack of skills and experience. (She had been a mother and homemaker during most of the long term marriage.) Both parties were in their fifties. Mark was in good health but Zelmira suffered from hyperthyroidism, type two diabetes and divorce related depression.

[¶ 19.] Mark contends that the trial court's determination that Zelmira had a need for $10,000 per month was clearly erroneous. He specifically points to four separate items Zelmira listed in her monthly budget: a monthly allowance for life insurance, car payments, credit card/loan payments and clothing for their adult children. Zelmira addressed her need for the insurance expense claiming it was for health insurance incorrectly labeled as life insurance. The defense pointed out a second listed health insurance expense for which she did offer an explanation. Although her explanation for the discrepancy is somewhat unclear, it was within the court's province to weigh the credibility of her explanation. Concerning the credit card/loan payments, Mark claims that he was awarded all of the marital debt leaving no reason for her to include a debt payment in her budget. However, this argument ignores the trial court's conclusion that certain joint debts "should be paid by the party who incurred the debt," and it also overlooks the possibility that the court was allowing for Zelmira to carry a debt in the future. Mark also challenges the expenses for her car payments and for their adult children's clothing. Whether these items are reasonable under the circumstances is left to the sound discretion of the trial court. In this case, it was not unreasonable for the trial court to allow budget items in the nature of gifts of clothing or other items to college age children; nor was it unreasonable to anticipate expenses for future vehicles. These activities and expenses would be normal

for someone with her station and social standing in life. Therefore, the trial court's alimony award was not an abuse of discretion. The trial court properly considered the relevant factors when determining the award, and its final award was reasonable and supported by the evidence.

*Attorney Fees*

[¶ 20.] Mark agreed to pay the attorney's fees associated with the trial court proceedings. On appeal Zelmira has made a motion for appellate attorney fees of $3,469.94, the amount she submitted in her verified, itemized statement of legal services rendered. "In considering fees for the appeal, we must consider 'the property owned by each party, their relative incomes, the liquidity of the assets and whether either party unreasonably increased the time spent on the case.'" *Arneson v. Arneson*, 2003 SD 125, ¶ 38, 670 N.W.2d 904, 917 (quoting *Barnes v. Matzner*, 2003 SD 42, ¶ 24, 661 N.W.2d 372, 379). Considering these factors along with the merits of the issues on appeal, we award attorney fees to Zelmira in the amount requested.

[¶ 21.] The trial court is affirmed.

[¶ 22.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.