#24903-aff in pt, rev in pt & rem-JKM

**2009 SD 31**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

DEBRA SUE WALKER, Plaintiff and Appellee,

v.

EDWARD WALKER, JR., Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE TONY PORTRA
Judge

\* \* \* \*

RICHARD L. RUSSMAN of
Richardson, Wyly, Wise,
  Sauck & Hieb, LLP                   Attorneys for plaintiff
Aberdeen, South Dakota               and appellee.

DREW C. JOHNSON                      Attorney for defendant
Aberdeen, South Dakota               and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON FEBRUARY 17, 2009

OPINION FILED **05/06/09**

#24903

MEIERHENRY, Justice

[¶1.]        Edward Walker appeals from the divorce judgment from Debra Walker.  Edward argues that the circuit court abused its discretion (1) by denying Edward's request for alimony, (2) by awarding the 2002 Chevrolet Trailblazer to Debra and requiring Edward to pay the debt against the vehicle, and (3) by denying Edward's claim for attorney fees from Debra.  We affirm issues (1) and (2) and reverse and remand issue (3).

## STANDARD OF REVIEW

[¶2.]        We review a circuit court's award or denial of alimony, division of property, or the award or denial of attorney fees under the abuse of discretion standard.  Billion v. Billion, 1996 SD 101, ¶14, 553 NW2d 226, 230 (citations omitted).  "We find an abuse of discretion when discretion is exercised 'to an end or purpose not justified by, and clearly against, reason and evidence.'"  Novak v. Novak, 2006 SD 34, ¶3, 713 NW2d 551, 552 (quoting Godfrey v. Godfrey, 2005 SD 101, ¶11, 705 NW2d 77, 80).  When reviewing a divorce appeal, we will not overturn the circuit court's findings of fact unless they are clearly erroneous.  *Id.*  "When applying [the abuse of discretion] standard, we do not inquire whether we would have made the same decision.  Instead, we decide only whether the circuit court could reasonably reach the conclusion it did in view of the applicable law and the circumstances of the case."  Maxner v. Maxner, 2007 SD 30, ¶12, 730 NW2d 619, 622 (citing Zepeda v. Zepeda, 2001 SD 101, ¶20, 632 NW2d 48, 55).

## FACTUAL BACKGROUND

[¶3.]        This marriage was the third marriage for Edward and the second marriage for Debra.  They were both approximately forty-four years of age at the time they married in March of 1997.  They both had children from a prior marriage but none together.  The couple remained married for eleven years.

[¶4.]        Both parties were employed during the marriage.  Debra worked as a counselor at Northern State University.  Edward was last employed with Dakota, Minnesota, and Eastern Railroad until a motorcycle accident in 2005 left him paralyzed from mid-chest down.  At the time of trial, Edward no longer worked as a result of the accident.  The trial court found that Edward received $2,552[1] a month from his railroad retirement account.  Debra's monthly income at time of trial was $2,519 per month.

[¶5.]        Prior to the marriage, the parties entered into an antenuptial marital property agreement wherein the parties expressed their "desire to fix and determine the rights of each of them in any and all property."  The agreement recited the parties' wishes to "retain . . . all of his or her estate to the same extent as if each of the parties had remained single."  Edward's premarital estate consisted of $20,704 of property assets and $19,582 of debt.  Debra's premarital estate was $931,965 of

---

1.    In the appellate briefs, both parties refer to Edward's monthly income as $2,521 based on his trial testimony (Edward subtracts his Medicare B payment of $96 from this amount for a monthly income of $2,425).  The trial court, however, found that Edward's income was $2,552.  The $2,552 amount most likely was determined by dividing Edward's 2008 income (as shown in one his exhibits) of $30,627.09 by twelve months.  Neither party argues that the finding of fact regarding Edward's income is clearly erroneous.  Therefore, the $2,552 figure will be used in this opinion.

property assets and $8,978 of debt. Most of Debra's premarital property came from the property settlement from her first marriage. The parties waived any claim to each other's premarital property, to alimony or to attorney's fees should the marriage end in divorce. The waiver provision in the agreement provided as follows:

> The parties hereto expressly further agree to and with each other, that if they should become separated or divorced, also in connection with any actions brought by either party against the other for separation, divorce, or annulment of the marriage, that *neither party shall apply to the Court for any legal expenses, attorney's fees, alimony, temporary alimony, support, or for a property settlement* in connection therewith and in [the] case of any separation or divorce or annulment of the marriage whether such separation be voluntary or by legal action, such party hereby waives as against the other any rights or claims for alimony, temporary or permanent, support, property settlement, legal expenses, and attorney's fees to the extent allowed by law.

(Emphasis added.)

[¶6.] The agreement also acknowledged that any "jointly owned assets" acquired by the parties during the marriage would "be divided equitably between the parties as of the date of the separation, or divorce or annulment." The parties did acquire assets during the marriage that were subject to equitable division. Those assets included approximately twenty-eight acres of land near Hill City, South Dakota. This property sold prior to the divorce for $308,000, and the proceeds were held in escrow to be divided as part of the divorce. They had also acquired ten acres of land in Louisiana, and timeshares in Florida and Utah. Most of the money to purchase the properties came from Debra's premarital assets. Debra contributed approximately $175,000 to purchase the Hill City property, and Edward contributed approximately $7,000. Debra also provided $30,000 to

purchase the Louisiana property and $22,000 to purchase the timeshares in Florida and Utah.  At the time of the divorce, the parties owned a 2002 Chevrolet Trailblazer vehicle and a 2005 handicap equipped van.  The couple also had other personal property that was not in dispute on appeal.

[¶7.]    In dividing the marital property, the circuit court awarded each party one-half of the proceeds from the sale of the Hill City property.  The court ordered that the Louisiana property and the timeshares in Florida and Utah be sold and the proceeds divided equally between the parties.  Edward received the handicap van and Debra the Trailblazer.  The loan on both vehicles was assigned to Edward.

[¶8.]    Edward requested alimony in the form of a lump-sum payment of at least $400,000.  In his proposed findings of fact and conclusions of law, Edward suggested that Debra fund the lump-sum payment partially with her half of the proceeds from the sale of the Hill City property and the remainder with her pre-marital assets.  The court denied Edward's request for alimony and for attorney fees.  Edward appeals.  He claims that the circuit court abused its discretion by not awarding alimony, by not assigning the debt on the 2002 Trailblazer to Debra, and by denying Edward's claim for attorney fees.

### ANALYSIS

*Edward's Alimony Request*

[¶9.]    We have previously determined that the portion of an antenuptial agreement waiving alimony is not enforceable.  Sanford v. Sanford, 2005 SD 34, ¶38, 694 NW2d 283, 293 (invalid provisions "may be severed from valid portions of the prenuptial agreement without invalidating the entire agreement."); *see also*

SDCL 25-2-18 (providing the subject matter upon which parties to a premarital agreement may contract). Thus, the circuit court appropriately considered Edward's claim for alimony regardless of the antenuptial agreement to the contrary.

[¶10.] South Dakota law gives a trial court discretion to award alimony in a divorce as follows:

> Where a divorce is granted, the court may compel one party to make such suitable allowance to the other party for support during the life of that other party or for a shorter period, as the court may deem just, having regard to the circumstances of the parties represented; and the court may from time to time modify its orders in these respects.

SDCL 25-4-41. A trial court's decision to grant or deny alimony is guided by the circumstances of the parties with consideration of the following factors: "the length of the marriage, earning capacity of the parties, financial condition after the property division, age, health and physical condition of the parties, the parties' station in life or social standing, and fault." Wilson v. Wilson, 434 NW2d 742, 745 (SD 1989) (citations omitted).

[¶11.] Further, "[a] circuit court is required to consider the allocation of property and spousal support together." Terca v. Terca, 2008 SD 99, ¶28, 757 NW2d 319, 326 (citing Evans v. Evans, 1997 SD 16, ¶31, 559 NW2d 240, 247). Courts are to consider property division and spousal support jointly because "an award of more assets can eliminate or reduce the need for spousal support and vice versa." Id. (citing Heckenlaible v. Heckenlaible, 1996 SD 32, ¶20, 545 NW2d 481, 485). The party seeking alimony has the burden to establish the need for alimony and that the other party has the ability to provide for all or some of the need. Fausch v. Fausch, 2005 SD 63, ¶17, 697 NW2d 748,755 (citations omitted).

[¶12.]       In support of his alimony claim, Edward presented his monthly budgetary needs. He claimed that his monthly living expenses totaled $3911. Included in his monthly expenses was $979 for health-related costs.[2] Edward, however, indicated that his health-related costs would change because of his eligibility for Medicare. With Medicare, he claimed that his health-related costs would be $1021, which would increase his monthly budget needs by $42.

[¶13.]       The circuit court, in considering Edward's monthly expenses, found that Edward had inflated some of his claimed expenses. The court determined that Edward's grocery budget was inflated, in part, by liquor purchases. Edward agreed on cross-examination that Debra should not have to pay for his alcohol, which amounted to about $122 of the $464 he had budgeted for groceries. The court found $300 a month a reasonable amount for groceries. Edward does not specifically challenge the court's findings as clearly erroneous. He simply claims that it was error for the court to reduce his grocery bill and that he should be able to maintain his current standard of living. Edward also admitted that he had overstated his average utility expenses by $26 a month.

[¶14.]       Edward's monthly budget also included outstanding debts that the court determined could be paid in full with the cash Edward would receive from the divorce. Payment of the debts would reduce his monthly expenses accordingly. Those outstanding debts consisted of a loan payment of $485, credit card payments of $431, and a furniture payment of $61.

---

2.       He claimed $167 for prescriptions and medical supplies, $140 for hospital and clinic bills, $352 for COBRA health coverage, and $320 for home health services.

[¶15.]    Additionally, Edward budgeted $320 a month for home health services. However, he testified that he normally paid about $200 per month for the home health services. Debra challenged the amount and submitted evidence that the Edward's home health services could be paid by Medicare. It is not clear from the findings what amount, if any, the circuit court considered as part of Edward's monthly expenses. With his home health care expense of $200 a month and the other reductions recognized by the circuit court, Edward's monthly expenses totaled approximately $2,666.

[¶16.]    Edward received $2,552 a month from his railroad pension. He had $49,638 in his 401K fund (value at trial)[3] and $124,000 cash from his portion of the Black Hills property.[4] He will also receive his one-half of the proceeds from the sale of the two timeshare properties and the Louisiana property. Neither party offered evidence of the fair market value of these properties. The only evidence as to the value was their purchase price; consequently, the court did not assign a value to them.

---

3.    Edward presented various figures on the value of his 401(k) ranging from a high of $49,638 as shown on a statement introduced into evidence at trial to $46,000 in his proposed findings of fact to a low of $44,000 submitted to the court as part of a post-trial motion. The $49,638 value was the value used as part of Edward's financial planner's analysis and testimony.

4.    Edward had received $30,000 of his share of the Black Hills property in advance. If he used some of the remainder to pay off his debt, his debt would be reduced further. His debt at time of trial was approximately $23,000 including the car loans, credit card debt, and his debt on his personal line of credit.

[¶17.]     At trial, Edward requested a *lump-sum* alimony award rather than a *monthly* alimony amount.[5] Edward's theory was to create a fund in a sufficient amount to pay for his needs for the rest of his life. The principal and earnings from the fund would be amortized over his projected lifetime to supplement his income from his railroad pension and 401(k) to meet his projected lifetime needs. The requisite amount of funding was based on testimony of Edward's financial planner, Darrell Strivens, CPA, with the firm of Eide Bailey. Strivens testified that over Edward's life expectancy of twenty-one years, Edward would have a cash flow shortfall. To arrive at an amount sufficient to meet the shortfall, Striven used Edward's average monthly expenditures (provided by Edward) and Edward's monthly receipt of funds. Strivens then applied inflationary assumptions and a projected rate of return through the year 2028. He offered two versions -- one based on a higher rate of inflation and one on a lower rate of inflation. Using the higher rate of inflation, Strivens testified that the fund would need $777,000 in present value in order to provide for Edward's lifetime cash flow shortfall. Using the lower rate of inflation, he set the amount at $430,036.[6] Edward proposed that the funds would come from the following sources: $49,638 from Edward's 401(k) account,

---

5.    In a trial exhibit, Edward refers to monthly alimony from Debra in the amount of $2,000. However, this amount was not advocated at trial nor does it appear to be supported by testimony or evidence in the record. In Edward's proposed findings of fact and conclusions of law, he only sought alimony in the form of a lump-sum payment. In his appeal brief, Edward alternatively asks for a monthly alimony amount of "about $1,500 from Debra."

6.    In his appellate brief, Edward refers to the necessary funding amount as $400,000.

$124,000 from his half of the Black Hill's property sale, and the rest from Debra. At trial, he proposed that Debra's contribution would come from her half of the Black Hill's property sale ($124,000) and a minimum of $132,398 from her premarital assets.[7]

[¶18.]     The court considered the circumstances of the parties and applied the various factors in determining whether to grant Edward's request for alimony. The court noted that this eleven-year marriage was the third marriage for fifty-four year-old Edward and the second marriage for fifty-five year-old Debra. The court found that Edward was unable to work because of his disability but received disability payments in the amount of $2,552 a month. The court found that Debra was generally in good health but suffered from fibromyalgia and needed to have both knees replaced. Nevertheless, the court found that she was capable of maintaining full-time employment and that her net monthly earnings were $2,519. The court determined that the parties' social standing would be approximately the same as it had been prior to the separation. The parties agreed to a divorce on irreconcilable differences. Both testified as to problems in the marriage involving Edward's temper and Debra's lack of patience and nurturing. The circuit court found that the reason for the divorce was "simply an inability to get along any further" and that neither party was at fault.

[¶19.]     After considering the circumstances and factors, the circuit court denied Edward's request for a lump-sum alimony award. The court concluded that

---

7.     The figures Edward uses in his appellate brief vary from the figures he used at the trial court level in his proposed findings of fact and conclusions of law.

Edward had not shown a need for the alimony. The court expressed concern about the accuracy of the amount of Edward's lump-sum request because the projection was based on uncertain or inaccurate assumptions. The court further determined that the monthly expenses relied upon to make the projections were overstated. The court also looked at Edward's income and assets from the divorce and concluded that he was able to support himself from his railroad pension, his 401(k), and the property he received in the divorce. Additionally, the court looked at Debra's earnings and her assets and concluded that she did not have the ability to pay alimony.

[¶20.] Edward argues that the circuit court failed to consider Debra's premarital property as part of her earning capacity when determining whether to award alimony. In effect, Edward is attempting to nullify his agreement to waive any claim to her premarital property by labeling his claim as alimony. The antenuptial agreement legally prohibits either party from claiming premarital property of the other spouse even in the form of alimony. Nevertheless, Edward proposes that approximately $130,000 of his alimony request come from Debra's premarital funds. The majority of Debra's premarital assets at the time of the trial were in the form of investment accounts worth approximately $629,000. The accounts had been funded by her ex-husband as part of her divorce settlement. She receives no income or dividends from the investment accounts and cannot access the funds without penalty until the age of fifty-nine and one-half.

[¶21.] Under similar facts, a Florida District Court of Appeal held that a lump-sum alimony award "must be carefully restricted in its amount so that it does

not appear to contradict the terms of the [antenuptial] contract." Hannon v. Hannon, 740 So2d 1181, 1188 (FlaDistCtApp 1999). In *Hannon*, the wife had requested a lump-sum alimony award. It was a second marriage for the couple, and they had entered into an antenuptial contract that provided for each to keep his or her separate property. As part of the agreement, the husband agreed to support the wife during his lifetime if the couple divorced. The trial court awarded the wife a lump-sum payment that conceivably would have extended beyond the husband's life. The appellate court reversed the lump-sum award because it was contrary to the couple's antenuptial agreement. The court analyzed the effect of an antenuptial agreement as follows:

> A primary purpose of an agreement is to modify or shrink the general discretion of the dissolution of marriage judge in doing equity between the parties. The agreement itself is intended to define the mutual equities, and the trial judge is not free to ignore its provisions or to render them ineffective. . . . Dissolution of marriage courts should attempt to give effect to nuptial agreements that are, as here, properly made and fully enforceable.

*Id*. at 1187. Our cases also recognize that the purpose of an antenuptial agreement is to limit the discretion of a trial judge in a divorce and that valid agreements as to property division are enforceable. *See Sanford*, 2005 SD 34, ¶38, 694 NW2d at 293-94.

[¶22.] Debra and Edward agreed not to claim each other's premarital property. Edward did not challenge the validity of the agreement, except for the waiver of alimony. Thus, the trial court was limited to the parties' agreement and could not consider Debra's premarital property available to fund a lump-sum award of alimony. Edward's request for a lump-sum award was based, in part, on Debra's

premarital property. Edward did not present a case for how Debra had the ability to pay alimony if her premarital property was not considered. Debra's net monthly income was $2,519; Edward's net monthly income was $2,552. Debra otherwise received no income or dividends from any of her property. After the property settlement Edward had property in excess of $174,000 from the Hill City, Louisiana, Utah, and Florida properties, purchased mainly by using Debra's premarital assets. Further, the court divided the value of these properties equally between the parties regardless of the fact that Debra supplied her non-marital funds to finance most of the properties. Edward will receive $49,638 from his 401(k), $124,000 as his share of Black Hills property, plus one-half the proceeds of the other property yet to be sold. Without the premarital property, Edward has not shown that Debra has sufficient earning capacity to provide alimony.

### Vehicle Division and Vehicle Debt

[¶23.] Edward also argues that the trial court abused its discretion when it awarded the 2002 Chevrolet Trailblazer to Debra and required Edward to pay the debt against the vehicle. Edward originally purchased and drove the Trailblazer. He had a loan for its purchase from his credit union. Debra drove a van at that time. After his injury, they traded Debra's van for a handicap equipped van for Edward, and Debra used the Trailblazer. At the time of trial, Edward's loans against the vehicles were $3,143 on the van and $7,893 on the Trailblazer. They agreed, as part of the divorce, that Edward would get the handicap van and Debra the Trailblazer. The court, however, did not reassign Edward's loan on the Trailblazer to Debra. The trial court explained its rationale as follows: "[g]iven the

circumstances as to how each person came to be in possession of the vehicles that each now has and the fact that Debra traded in her van to help purchase Edward's current van, Edward will be responsible for the debt on the vehicles through the Huron credit union."

[¶24.]     We do not reverse a distribution of property absent an abuse of discretion. *Fausch*, 2005 SD 63, ¶5, 697 NW2d at 751 (quoting Grode v. Grode, 1996 SD 15, ¶6, 543 NW2d 795, 799). A reversal on this one item would require us to find that the court's discretion was exercised "'to an end or purpose not justified by, and clearly against, reason and evidence.'" *Novak*, 2006 SD 34, ¶3, 713 NW2d at 552 (quoting *Godfrey*, 2005 SD 101, ¶11, 705 NW2d at 80). We normally review the overall property division of the court, not an item by item analysis. We have consistently emphasized that we do not substitute our judgment for that of the trial court. Anderson v. Aesoph, 2005 SD 56, ¶18, 697 NW2d 25, 31 (citations omitted). Even if we may have decided it differently, the party must show that the trial court abused its discretion. *See Fausch*, 2005 SD 63, ¶5, 697 NW2d at 751 (quoting Grode v. Grode, 1996 SD 15, ¶6, 543 NW2d 795, 799). Here, Debra used her premarital assets to finance the majority of the marital property purchases. Regardless of the fact that Debra provided most of the money, the trial court divided the marital property equally between the parties. In fact, Debra received less for her half of the proceeds of the sale of the Hill City property than she contributed for the original purchase of the property. Consequently, in light of the overall property distribution, Edward has not shown that the court's decision to have Edward continue to pay the debt on both vehicles was unjustified and "clearly against,

reason and evidence." *Novak*, 2006 SD 34, ¶3, 713 NW2d at 552 (quoting *Godfrey*, 2005 SD 101, ¶11, 705 NW2d at 80).

***Attorney Fees***

[¶25.]     Edward contends that the circuit court abused its discretion when it refused his request for attorney's fees. He argues that Debra unreasonably elevated the cost of litigation. Edward also argues that the provision of the antenuptial agreement waiving the right to attorney fees does not apply. He contends that the provision of the antenuptial agreement that waived rights to attorney's fees violates public policy. We agree in part and hold that those attorney fees attributable to the alimony claim may be awarded in the discretion of the court. In *Sanford v. Sanford*, we determined that public policy precludes a waiver of alimony in a prenuptial agreement. 2005 SD 34, ¶38, 694 NW2d at 293. The logical extension of our holding is that attorney's fees associated with an alimony award also cannot be prohibited by the prenuptial agreement. Consequently, we remand for the circuit court to consider Edward's request for attorney fees as they relate to his alimony request.

[¶26.]     Edward's request for appellate attorney fees is granted in the amount of $2,000. *See* SDCL 15-26A-87.3.

[¶27.]     GILBERTSON, Chief Justice, and KONENKAMP and ZINTER, Justices, and SABERS, Retired Justice, concur.